[920 NYS2d 135]

In the Matter of SING W.C. SING Y.C., Petitioner; WAI M.C. et al., Respondents. NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES, Nonparty Appellant.

Second Department, March 22, 2011

## APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Kristin M. Helmers* and *Norman Corenthal* of counsel), for nonparty appellant.

### OPINION OF THE COURT

PRUDENTI, P.J.

This proceeding was commenced by a petition seeking to appoint a guardian for a person under the age of 21, but over the age of 18, pursuant to Family Court Act § 661 (a), for the purpose of facilitating an application for special immigrant juvenile status under federal law, which, in turn, would enable the ward to apply for lawful permanent residency in the United States. The issue before us on this appeal, apparently one of first impression in the appellate courts of this state, is whether the Family Court had the authority to direct the New York City Administration for Children's Services (hereinafter ACS) to conduct an investigation or home study with respect to the prospective guardian.

Under federal law, a person who is granted special immigrant juvenile status is able to achieve lawful permanent residency in the United States without first obtaining a visa (*see Riley v Gantner*, 2003 WL 22999487, *2-3, 2003 US Dist LEXIS 22929, *5-7 [SD NY 2003]). To be eligible for special immigrant juvenile status, a person must be under 21 years of age, unmarried, and declared to be dependent upon a juvenile court or legally committed to, or placed under the custody of, a state agency or an individual or entity appointed by a state court (*see* 8 USC § 1101 [a] [27] [J] [i]; 8 CFR 204.11 [c]; *Matter of Jisun L. v Young Sun P.*, 75 AD3d 510, 511 [2010]; *Matter of Trudy-Ann W. v Joan W.*, 73 AD3d 793, 795 [2010]). The appointment of a guardian constitutes the necessary declaration of dependency on a juvenile court (*see Matter of Jisun L. v Young Sun P.*, 75 AD3d at 512; *Matter of Trudy-Ann W. v Joan W.*, 73 AD3d at 795-796; *Matter of Antowa McD.*, 50 AD3d 507 [2008]). Addition-

ally, a court must find that reunification of the person with one or both of the person's parents is not viable due to parental abuse, neglect, abandonment, or similar parental conduct defined under state law, and that it would not be in the person's best interest to be returned to his or her native country or country of last habitual residence (*see* 8 USC § 1101 [a] [27] [J] [i], [ii]; *Matter of Jisun L. v Young Sun P.*, 75 AD3d at 511; *Matter of Emma M.*, 74 AD3d 968, 969 [2010]; *Matter of Trudy-Ann W. v Joan W.*, 73 AD3d at 795).

Family Court Act § 661 (a) governs "[g]uardianship of the person of a minor or infant." That statute, which had previously been interpreted as applying only to persons under the age of 18 (*see Matter of Vanessa D.*, 51 AD3d 790 [2008]; *Matter of Luis A.-S.*, 33 AD3d 793, 794 [2006]), was amended by the Legislature in 2008, in response to the federal law and regulations creating special immigrant juvenile status and making it available to immigrants under the age of 21 (*see* Sobie, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 661, 2011 Pocket Part, at 62). The statute now provides that "[f]or purposes of appointment of a guardian of the person pursuant to this part, the terms infant or minor shall include a person who is less than twenty-one years old who consents to the appointment or continuation of a guardian after the age of eighteen" (Family Ct Act § 661 [a]). Thus, Family Court Act § 661 (a) now permits the Family Court to appoint a guardian for a youth between the ages of 18 and 21, in order to establish that the youth is "dependent on a juvenile court" (8 USC § 1101 [a] [27] [J] [i]) for purposes of an application for special immigrant juvenile status.

The case before us involves Sing W.C., who was born in Hong Kong on January 7, 1992. In May 2010, Sing W.C.'s older brother, Sing Y.C., then age 25, filed a petition in the Family Court, requesting that he be appointed Sing W.C.'s guardian. In support of the petition, Sing W.C. submitted an affidavit, attesting to the following facts. While growing up in Hong Kong, Sing W.C. was frequently beaten by his father, and since his parents worked long hours at a factory, he was often cared for by his grandmother. In 2003, Sing W.C.'s parents moved to the United States, entering the country on tourist visas, and they brought Sing W.C. and Sing Y.C. with them. Sing W.C.'s father and brother worked in a restaurant and lived in a dormitory above the restaurant, separate from Sing W.C. and his mother. The family subsequently moved together into an apartment in Flush-

ing, Queens, but Sing W.C.'s father continued to sleep at the restaurant, and Sing W.C. only saw his father about once every two weeks. After Sing W.C.'s father lost his job and moved in with the rest of the family, he began drinking heavily, and frequently beat Sing W.C.'s mother severely. When the mother called the police after one such incident, the father left the family's home, and Sing W.C. never saw him again. Sing W.C. and his mother moved into a friend's apartment, but the mother was "never around." The mother then moved to Arizona, and Sing W.C., now a senior in high school, decided to remain in New York and finish school. Sing Y.C. and his wife, who live in a Flushing apartment with a female roommate, allowed Sing W.C. to move in with them. Sing W.C. asserted in his affidavit that "[t]here is really no way I could go back to Hong Kong. The only relatives I have there are very distant and I haven't spoken to them since I came to the U.S."

The guardianship petition alleged, inter alia, that Sing W.C.'s mother "has never provided [him] with proper financial support and [his] father has not provided [him] with financial support since 2008." In July 2010, Sing W.C.'s mother submitted an affidavit renouncing her right to guardianship of Sing W.C., waiving service of process in the guardianship proceeding, and consenting to the issuance of letters of guardianship to Sing Y.C.

In an order dated May 25, 2010, the Family Court directed ACS to "conduct a Home Study in this matter concerning the attached petition(s) and submit a written report to the Court by July 23, 2010." ACS appeals, by permission, from this order.

ACS contends that, since it was created by statute to investigate reports of suspected abuse and maltreatment of children, and the term "child" is defined as a person under the age of 18, ACS lacked the authority to perform an investigation in connection with a petition for the appointment of a guardian for Sing W.C., who was over the age of 18 and, therefore, the Family Court lacked the authority to direct ACS to conduct such an investigation on the court's behalf.

In determining that it had the authority to direct ACS to conduct an investigation in connection with this guardianship proceeding, the Family Court relied on Family Court Act § 255, which provides:

> "It is hereby made the duty of, and the family court
> or a judge thereof may order, any state, county, mu-

nicipal and school district officer and employee to render such assistance and cooperation as shall be within his legal authority, as may be required, to further the objects of this act . . . . The court is authorized to seek the cooperation of, and may use, within its authorized appropriation therefor, the services of all societies or organizations, public or private, having for their object the protection or aid of children or families, including family counselling services, to the end that the court may be assisted in every reasonable way to give the children and families within its jurisdiction such care, protection and assistance as will best enhance their welfare."

An order made under Family Court Act § 255 must be "one which is within the legal authority of the person or institution to which it is addressed and one which is required to further the objects of the Family Court Act" (*Matter of Hasani B.*, 195 AD2d 404, 405 [1993]; *see Matter of Lorie C.*, 49 NY2d 161, 168 [1980]).

The Family Court concluded that the investigation called for in this case was within the scope of ACS's legal authority, since ACS has a statutorily imposed duty to "[i]nvestigate the family circumstances of each child reported to [it] as destitute, neglected, abused, delinquent, disabled or physically handicapped in order to determine what assistance and care, supervision or treatment, if any, such child requires" (Social Services Law § 398 [6] [a]). The court also cited a section of the Uniform Rules for the Family Court which provides:

"The probation service or an authorized agency or disinterested person is authorized to, and at the request of the court, shall interview such persons and obtain such data as will aid the court in . . .

"exercising its power under section 661 of the Family Court Act to appoint a guardian of the person of a minor under the jurisdiction of the court" (22 NYCRR 205.56 [a] [2]).

ACS is an "authorized agency" (*see* Social Services Law § 371 [10] [a] [definition of "(a)uthorized agency" includes "(a)ny agency . . . which is . . . empowered by law to care for (or) to place out . . . children"]).

On appeal, ACS contends that the Family Court was not authorized to direct it to conduct an investigation in this case. ACS reasons as follows. Family Court Act § 255, on which the

Family Court principally relied, requires agencies like ACS to render only that assistance and cooperation which is "within [their] legal authority." ACS derives its statutory authority from section 617 of the New York City Charter, which, in defining the powers and duties of ACS, provides that it is to act as "a child protective service" and "perform functions related to the care and protection of children." (NY City Charter § 617 [a] [1].) The authority of a "child protective service" is circumscribed by Social Services Law § 423 (1) (a), which provides that "[t]he child protective service shall perform those functions assigned by this title [i.e., title 6 of article 6 of the Social Services Law] to it and only such others that would further the purposes of this title." The purposes of title 6 of article 6 of the Social Services Law, in turn, are described in Social Services Law § 411, which provides that

> "[a]bused and maltreated children in this state are in urgent need of an effective child protective service to prevent them from suffering further injury and impairment. It is the purpose of this title to encourage more complete reporting of suspected child abuse and maltreatment and to establish in each county of the state a child protective service capable of investigating such reports swiftly and competently and capable of providing protection for the child or children from further abuse or maltreatment and rehabilitative services for the child or children and parents involved."

Thus, ACS argues, the mission of ACS is to protect children, and children are individuals under the age of 18. Specifically, Social Services Law § 371 (1) provides that *"[u]nless the context or the subject matter manifestly requires a different interpretation,* when used in this article or in any special act relating to children, . . . 'Child' means a person actually or apparently under the age of eighteen years"* (emphasis added).

■ We find ACS's argument to be defeated by the unmistakable legislative intent underlying the 2008 amendment of Family Court Act § 661 (a). In amending that statute, the Legislature expressly extended the provisions for appointing a guardian for the person of a minor or infant—terms which are elsewhere defined as referring to persons under the age of 18 (*see* Family Ct Act § 119 [c])—to individuals between the ages of 18 and 21. In light of the protective purpose underlying the federal government's creation of special immigrant juvenile status, a

purpose adopted by our Legislature in amending Family Court Act § 661 (a), we have little difficulty in concluding that, in a proceeding under section 661 (a), the context and the subject matter "manifestly require[ ]" (Social Services Law § 371) that the meaning of the term "child" likewise be expanded to include all persons under the age of 21.

The Family Court reached the same conclusion in this matter, and in response, ACS contends that "[t]he relevant contexts for purposes of defining the authority of the child protective service are those arising in furthering the objectives of Social Services Law [article 6, title 6]." This argument brings us back to our original inquiry as to what furthers the objectives of Social Services Law article 6, title 6, and thus lies within ACS's authority. Contrary to ACS's contention, this inquiry does not lead to the conclusion that the instances in which "the context or the subject matter" includes persons older than 18 are limited to "situations such as continuing placements, with the child's consent, after his or her eighteenth birthday (*see* Family Ct Act § 1055 [e]), and permanency planning for such children (*see* Family Ct Act § 1087)." The statutorily enumerated purposes of a child protective service such as ACS include preventing "[a]bused and maltreated children in this state" from "suffering further injury and impairment," "investigating such reports [of suspected child abuse and maltreatment] swiftly and competently," and "providing protection for the child or children from further abuse or maltreatment" (Social Services Law § 411). We find these objectives to be congruent with those underlying Family Court Act § 661 (a), particularly when that statute is employed to facilitate the procurement of special immigrant juvenile status. Indeed, the very reason for the existence of special immigrant juvenile status is to protect the applicant "from further abuse or maltreatment" by preventing him or her from being returned to a place where he or she is likely to suffer further abuse or neglect. In this case, for example, Sing W.C. was allegedly "abused," he is "in this state," and he is allegedly in need of protection "from further abuse or maltreatment" (Social Services Law § 411). Furthermore, as noted by the Family Court, ACS has a statutory duty to "[i]nvestigate the family circumstances of each child reported to [it] as . . . neglected [or] abused . . . in order to determine what assistance and care, supervision or treatment, if any, such child requires" (Social Services Law § 398 [6] [a]). Thus, the relief sought on Sing W.C.'s behalf, and the investigation ordered

by the Family Court to aid in its consideration of such relief, fall within ACS's legal authority and further the objects of the Family Court Act (*see* Family Ct Act § 255).

Since we have concluded that the subject matter and context of a guardianship proceeding commenced under Family Court Act § 661 (a) for the purpose of establishing a youth's eligibility for special immigrant juvenile status require that persons up to the age of 21 be deemed "children" within the meaning of Social Services Law § 371, ACS's reliance on *Matter of Amrhein v Signorelli* (153 AD2d 28 [1989]) is misplaced. In *Amrhein*, this Court held that the Surrogate's Court lacked the authority to order the Department of Social Services to conduct investigations, including home studies, of individuals who had petitioned for guardianship of children whom the Surrogate had found to be "abandoned" within the meaning of Social Services Law § 371 as a result of the death of their last surviving parent. This Court concluded that "the infants [in *Amrhein*] were not 'abandoned' within the meaning of the statute and there is no discernible context or subject matter that manifestly requires a different interpretation" (*Matter of Amrhein v Signorelli*, 153 AD2d at 32 [footnote omitted]). ACS contends that we should reach the same result here, since the courts may not assign investigative tasks to child protective services "with reference to a person who [does] not fall within the statutory definition of the persons who could be its responsibility or subject to its authority—in *Amrhein* a child who was not abandoned, and here, a person who is not a child under the age of eighteen." This argument fails because we have rejected the premise that Sing W.C. is not a "child" for purposes of the instant proceeding. Indeed, this Court recognized in *Amrhein* that the Department of Social Services had a duty to " '[s]upervise' " abandoned children until they were discharged to relatives, but held that the agency was "not required to perform investigations unless the child is abandoned within the meaning of the statute" (*Matter of Amrhein v Signorelli*, 153 AD2d at 33, quoting Social Services Law § 398 [6] [h]). In the instant case, by contrast, Sing W.C. falls within the coverage of the statute defining ACS's purpose (*see* Social Services Law § 411) and the statute defining its additional powers and duties (*see* Social Services Law § 398) because he is a "child" for present purposes, and is alleged to have been abused.

ACS further contends that other resources are available to the Family Court in considering a petition pursuant to Family

Court Act § 661 (a). Family Court Act § 252 (d) provides that "[t]he probation service shall be available to assist the court and participate in all proceedings under this act," and Family Court Act § 662 provides that "[r]ules of court, not inconsistent with any law, may authorize the probation service to interview such persons and obtain such data as will aid the court in exercising its power under section [661]."

█ As the Family Court correctly observed in this matter, "nothing in [Family Court Act § 252] precludes the Court from directing that [ACS], the public agency charged with the care and protection of children, conduct an investigation and thereafter report its findings to the Court." Although section 662 refers specifically to investigations conducted for the purpose of assisting the Family Court in making guardianship determinations under section 661, we conclude that this statute does not vest the authority or responsibility for conducting such investigations exclusively in the probation service, and does not preclude a court from enacting rules authorizing the appointment of some other agency, such as ACS, to conduct such investigations.

The current version of section 662, along with the original version of section 661, was enacted as part of the original Family Court Act in 1962. The Legislature, in enacting section 662, could not have intended to exclude ACS as an entity that could be directed to conduct investigations, since ACS did not exist in 1962; ACS did not become the child protective service for the City of New York until 2001 (see NY City Charter §§ 615, 617 [a] [1]). Indeed, there was no such thing as a "child protective service" in this state until title 6 was added to article 6 of the Social Services Law in 1973 (see L 1973, ch 1039, § 1; Social Services Law § 423 [1] [a]). Thus, it is evident that the Legislature did not make a determination that the probation service was better suited than a child protective service to conduct investigations of prospective guardians and their homes in cases involving the appointment of a guardian for the purpose of protecting a youth from abuse or maltreatment. Rather, in 1962, the probation service was simply the only agency available for that purpose. The mere fact that the Legislature did not amend section 662 after 1973 to expressly authorize the appointment of child protective services such as ACS to conduct investigations in guardianship matters under section 661 does not bespeak a legislative intent to prevent the courts from making rules providing for the appointment of such entities to

conduct such investigations in cases where the courts find such entities to be best suited for the task. Requiring specific legislative authorization for every particular service an agency might be appointed to perform to assist a court would be incompatible with the Legislature's imposition on every state officer and employee of a general duty to "render such assistance and cooperation as shall be within his legal authority, as may be required, to further the objects of this act" (Family Ct Act § 255).

This reasoning leads us to conclude not only that the Family Court had the authority to direct ACS to conduct an investigation in this case, but also that it was within the power of the Chief Administrative Judge to adopt section 205.56 of the Uniform Rules for the Family Court, which specifically requires any "authorized agency," such as ACS, upon request of the Family Court, to "interview such persons and obtain such data as will aid the court in . . . exercising its power under section 661 of the Family Court Act" (22 NYCRR 205.56 [a] [2]; *see generally Levenson v Lippman*, 4 NY3d 280 [2005]; *People v Ramos*, 85 NY2d 678, 687-688 [1995]). In this case, the Family Court properly invoked that court rule in directing ACS to conduct an investigation or home study with respect to Sing W.C.'s prospective guardian.

In sum, we hold that, within the context of a proceeding commenced pursuant to Family Court Act § 661 (a) for the purpose of establishing eligibility for special immigrant juvenile status, the Legislature intended the meaning of the word "child" to include any individual under the age of 21. Accordingly, since the subjects of such proceedings are children and allegedly have been subjected to abuse or neglect, and the underlying purpose of the proceeding is to prevent further abuse or neglect, ACS's involvement is authorized and, thus, the Family Court has authority to require such involvement in the form of an investigation of the proposed guardian.

For the foregoing reasons, we affirm the order appealed from.

DILLON, BALKIN and CHAMBERS, JJ., concur.

Ordered that the order is affirmed, without costs or disbursements.