**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 9, 2012**

# In the Court of Appeals of Georgia

A12A1225. IN THE INTEREST OF J. J. X. C., a child.

BRANCH, Judge.

This appeal concerns a Guatemalan boy who, at age 15, came to the United States on his own, was apprehended at the border by customs officials, and was eventually released into the care of his brother Nicolas Xivir and Xivir's wife, Shaileen Santana, who live in Gwinnett County. Following a deprivation hearing initiated by Xivir and Santana, a juvenile court found the child to be deprived but failed to make two requested findings that are relevant to the child's immigration status. In their unopposed appeal, Xivir and Santana contend that, in so doing, the juvenile court erred. At oral argument, they asked this Court to reverse and remand the case to the juvenile court with instruction to reconsider the issue. There is no Georgia case law addressing the issues raised herein.

The record shows that on May 19, 2011, Xivir and Santana petitioned the Juvenile Court of Gwinnett County for a finding of deprivation regarding the boy and an order providing them with legal custody. See OCGA §§ 15-11-2 (8),15-11-35 (4) & 15-11-54 (a) (2). In their petition, Xivir and Santana asserted, as one ground of deprivation, that

> Pursuant to the Immigration and Naturalization Act § 101 (a) (27) (J) (iii) (I) [ ], should the Court enter an order finding that [J. J. X. C.] is dependent upon the juvenile court, that reunification with one or both parents is not viable and it is not in the "best interest" of the child to return to his parents' previous country or last habitual residence, a *Special Immigrant juvenile visa* may be obtained enabling [J. J. X. C.] to remain in the united States legally, and, if he so wishes, ultimately apply for citizenship.

(Emphasis in original.) In their brief for the court, the petitioners asked the court to make findings in that regard. At the subsequent hearings, the petitioners were represented by counsel, and the child was represented by a guardian ad litem.

The juvenile court held an emergency hearing on June 30, 2011, at which Santana testified that she was legally married to the child's brother, that she is a stay-at-home mother, and that her husband repairs computers. She introduced a certified copy of the child's Guatemalan birth certificate and an English translation. She

2

testified that the child came to live with her, her husband, and their child in February 2011 and that the child's parents live in Guatemala and are engaged in farming. She testified that in Guatemala, the child had been harassed by a gang that wanted him as a member and that he wanted to come to the United States to avoid the gangs and to protect his life. The child told them the gang had threatened to hurt his family. Santana further explained that the child is enrolled in high school, gets good grades, and is beginning to speak English. He has his own bedroom in the house, and the couple are willing and financially able to provide for him at least until he reaches age 18. The Department of Family and Children Services performed a study of their home in connection with the placement of the child.[1]

The juvenile court also accepted the appellants' tender of documentary evidence. In addition to the child's birth certificate, this evidence includes the child's progress report at school , information from the U. S. Department of State regarding Guatemala, a fact sheet entitled "Gangs in Guatemala" by the Guatemala Human Rights Commission/USA , and a report entitled "Guatemala Profile" by USAID – the United States Agency for International Development – regarding gangs operating in

---

[1] The study performed by DFACS was introduced at the hearing held July 6, 2011.

El Salvador, Guatemala, Honduras, Mexico, and Nicaragua.[2] At the end of the hearing, the court stated on the record that it was taking custody of the child on an emergency basis. No written order reflecting this ruling is in the record, but it is noted in the July 6 order.

On July 6, one week later, the court held the final hearing, at which, as in the emergency hearing, there was no opposing party. At this hearing, Xivir testified that his brother (who is not married) was born in Guatemala on October 12, 1995, and that in Guatemala, his brother lived with their parents in a two-bedroom home with electricity and shared a bedroom with other family members. Xivir testified that he, too, was born in Guatemala and that he came to the United States at age 14 because, beginning at age 13, his life was in danger because gangs involved with drug trafficking, violence and murder had "taken over" and were recruiting young boys,

---

[2] The "Gangs in Guatemala" fact sheet states that 80% of gang members in Guatemala belong to Mara Salvatrucha (also known as MS-13) and that "[g]ang members are involved in robbery, extortion, drug dealing, human trafficking, and turf wars with rival gangs." The "Guatemala Profile" states that gangs have become "public enemy number one" in Guatemala, that the youth of Guatemala are affected because children as young as eight years old are recruited , that "young men are both more likely to be victims of gang violence, as well as perpetrators"; that "large numbers of youth desperately in need of income turn to gangs to fill the economic void"; and that "[t]he judicial system currently does not have the capacity to deal with gang violence."

including him. Xivir was unable to obtain help because the Guatemalan police were corrupt and his parents were not helpful because "my father most of the time was drunk and my mother spoke only a language that is called Quiche." He added that his father never cared for him, rather, his mother did. He is equally fearful that his brother would face the same dangers he did in Guatemala. Xivir testified that he did not know his brother was coming until he received a call from immigration. And Xivir averred that he is able to provide food, medical care, and clothing for his brother and that his brother is enrolled in high school and doing well.

J. J. X. C. testified that although his parents do work (in farming), they were not able to provide for their large family. He testified he came to the United States because, starting when he was 14 years old, members of the MS-13 gang, who kill, steal, and sell drugs, were pressuring him to join and to engage in those activities. He testified that initiation in the gang involved being beaten by 10 or more other boys and that he would be in fear for his life if he told them he would not join. J. J. X. C. told his father, but when his father tried to do something about it, "the police didn't do anything." He added that his father was always drunk when he came home from work and did not care for him. Although his mother cared for him, she did not have the power to stop his father from drinking or to protect him from the gangs, in part

5

because she spoke an indigenous language, not Spanish. J. J. X. C. left Guatemala without telling his parents because he did not want a life of violence, he wanted to continue his studying, and his family did not have other contacts or means to move to another location. He believes that leaving Guatemala was his only option and that if forced to return, the gangs would contact him again and his family would not be able to protect him. J. J. X. C. concluded his testimony by stating that he wanted to live in the United States with his brother and family so that he could "study, graduate and go to the university."

The petitioners filed notarized statements in Spanish from the child's parents, along with notarized English translations, which state that the parents are unable to provide completely for their children; that they do not have the means to provide enough food, appropriate medical care, or other support that the child needs; and that it would be in the best interest of the child to be with his brother and family. The mother signed with a fingerprint.

In a written order, the court found that clear and convincing evidence had been presented to show that the child was deprived and dependent upon the court because "the child is within the borders of Georgia and without proper and adequate care and supervision from a biological parent or legal guardian." The court also found that the

child fled Guatemala because gangs were threatening him and trying to recruit him and he was afraid for his life and safety; that the parents had refused reunification; that family reunification was not a viable option; that the child cannot care for himself; and that it would be in the child's best interest to remain in his current placement with the petitioners as his guardians.

The appellants do not challenge the court's affirmative findings. The court's order is silent, however, with regard to the requested findings regarding the child's immigration status, and the appellants contend the court erred by failing to make those findings. At oral argument on appeal, the appellants stated that the child is currently the subject of removal proceedings.

Federal law provides a path to lawful permanent residency in the United States to resident alien children who qualify for "special immigrant juvenile" (SIJ) status. 8 USC § 1101 (a) (27) (J); 8 CFR § 204.11. "Congress created SIJ classification to protect abused, neglected, and abandoned immigrant youth through a process allowing them to become legal permanent residents." *Perez-Olano v. Gonzalez*, 248 FRD 248, 265 (III) (A) (1) (a) (CD Ca. 2008); see also *Yeboah v. United States Dept. of Justice*, 345 F3d 216, 221 (III) (A) (3rd Cir. 2003) ("an alternative to deportation").

To be eligible to petition the federal government for SIJ status, the resident alien must be under age 21 and unmarried. 8 CFR § 204.11 (c). The child must have been declared dependent upon a state juvenile court. 8 USC § 1101 (a) (27) (J). And the juvenile court must have made two additional findings: (1) that "reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law"; and (2) that "it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence." Id. at (i), (ii). See also 8 CFR § 204.11. The language of the first finding is designed to "prevent youths from using this remedy for the purpose of obtaining legal permanent resident status, rather than for the purpose of obtaining relief from abuse or neglect [or abandonment]." (Puntuation omitted.) *In re: Erick M.*, 284 Neb. 340, 347 (820 NW2d 639) (Neb. 2012), quoting 3 Charles Gordon et al., Immigration Law and Procedure § 35.09 (1) at 35-36 (rev. ed. 2001), citing H.R. Rep. No. 105-405 (1997) (Conf. Rep.).[3] See also *Yeboah*, 345 F3d at 222

---

[3] The Conference Report states that in 1997, the language of the statute was "modified in order to limit the beneficiaries of this provision to those juveniles for whom it was created, namely *abandoned, neglected, or abused children*, by requiring the Attorney General [now the Secretary of Homeland Security] to determine that neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect." (Emphasis supplied.) H.R. Rep. No. 105-405, at 130 (1997). See also Pub 110-457 (2008).

(III) (A). Although the juvenile court determines whether the evidence supports the findings, the final decision regarding SIJ status rests with the federal government, and, as shown, the child must apply to that authority. 8 USC § 1101 (a) (27) (J) (iii); *Perez-Olano*, 248 FRD at 265, n. 11.

Thus, the juvenile court[4] is charged with making the factual inquiry relevant to SIJ status when an unmarried, resident alien child is found to be dependent on the court. "The SIJ statute affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, or abandonment, and a child's best interests." *Perez-Olano*, 248 FRD at 265 (III) (A) (1) (a). Accordingly, courts in other states have held that a juvenile court errs by failing to consider a request for SIJ findings. See *In re Y. M.*, 207 Cal. App. 4th 892, 916 (II) (B) (144 Cal.Rptr.3d 54) (Cal.App. 2012) (child who is "potentially eligible for SIJ

_____

[4] The applicable statute states that the determination of whether it would not be in the alien's best interest to be returned must be made in "administrative or judicial proceedings." 8 U. S. C. A. § 1101 (a) (27) (J) (ii). See also 8 CFR 204.11 (a) (c) (6) ("judicial proceedings or administrative proceedings authorized or recognized by the juvenile court."). But the final rule issued in 1993 by the then-Immigration and Naturalization Service makes clear that the references to administrative proceedings do not mean proceedings before a federal agency. 58 FR 42843, 42847. As stated in the final rule in 1993, "Such administrative proceedings would most commonly be conducted by *state or local social service agency officials*. The Service does not intend to make determinations in the course of deportation proceedings regarding the 'best interest' of the child for the purpose of establishing eligibility for special immigrant juvenile classification." (Emphasis supplied.) Id.

status, . . . was entitled to a hearing where the juvenile court would determine whether findings required for SIJ status existed") (citation omitted). See also *In re Mohamed B.*, 83 A.D.3d 829, 831 (921 NYS2d 145) (NYAD 2011) (child moved for SIJ findings during guardianship proceeding in family court); *In the Interest of Luis G.*, 17 Neb. App. 377, 379 (764 NW2d 648) (Neb. App. 2009) (motions regarding SIJ status filed during juvenile cases addressing guardianship and foster care).

Here, however, the trial court's otherwise detailed written order is silent regarding any decision on the SIJ factors. See OCGA § 15-11-54 (a) ("on any petition alleging deprivation, the court shall make and file its findings as to whether the child is a deprived child"). It is apparent that the court started with an order drafted by the petitioners and that the court struck all provisions relevant to SIJ status, including the proposed findings. Nevertheless, it is not clear whether, in so doing, the court simply chose not to address the issue or concluded that it was not authorized to or was otherwise refusing to make the findings. The court did not state a basis for declining to make the SIJ findings nor did it state that it had considered the SIJ findings and rejected them. See, e.g., *Erick M.*, 284 Neb. at 351-352 (Neb. 2012) (juvenile court found that facts failed to show reunification with parent was not viable because of abuse, neglect, or abandonment).

10

Although the court was authorized to conclude that the petitioners failed to present evidence to support the SIJ factors or that their evidence was not credible, the court had a duty to consider the SIJ factors and make findings. In this unusual setting, where a state juvenile court is charged with addressing an issue relevant only to federal immigration law, we cannot affirm without some positive indication that the court actually addressed the issue. Our review of the juvenile court's decision is impaired by the lack of findings, and the child's immigration status hangs in the balance. See, e.g., *In the Interest of Luis G.*, 17 Neb. App. at 385 ("[W]ithout the order of eligibility, including the required findings from the state court, [applicants] would be barred from proceeding in the federal system with a valid application for special immigrant juvenile status and would face deportation to Guatemala."). Accordingly, we affirm the trial court's finding of deprivation but remand the case to the juvenile court with instruction to consider the request for SIJ findings in light of the facts and relevant law and to make relevant findings.

*Judgment affirmed in part and case remanded with direction. Miller, P. J., and Ray, J., concur.*