OPINION OF THE COURT
Roman, J.
Introduction
In 1990, Congress enacted the special immigrant juvenile provisions of the Immigration and Nationality Act (see 8 USC § 1101 [a] [27] [J], as added by Pub L 101-649, § 153, 104 US Stat 4978 [101st Cong, 2d Sess, Nov. 29, 1990]), which provide a gateway for undocumented children who have been abused, ne *102 glected, or abandoned to obtain lawful permanent residency in the United States. Prior to petitioning the relevant federal agency for special immigrant juvenile status, an immigrant juvenile must obtain an order from a state juvenile court making findings that the juvenile satisfies certain criteria. Among those findings is a determination that reunification with “1 or both” of the juvenile’s parents “is not viable due to abuse, neglect, abandonment, or a similar basis found under State law” (8 USC § 1101 [a] [27] [J] [i]). The principal issue presented on this appeal is whether a juvenile may satisfy this statutory reunification requirement when the juvenile court determines that reunification is not viable with just one, as opposed to both, of the juvenile’s parents. For the reasons that follow, we conclude that the “1 or both” language requires only a finding that reunification is not viable with one parent.
Factual and Procedural Background
Susy M.-G. was born in November 1994, in Honduras. As recounted in Susy’s affidavit in support of her motion, she lived alone with her mother, Marcelina M.-G., until she was about six years old. At that time, the mother’s boyfriend “Tony” began living with them part-time. Susy indicated that Tony was “mean and violent” toward her. Her mother “threw [Tony] out of [the] house” prior to the birth of Susy’s half-brother Jason in November 2001.
When Susy was about 10 years old, her mother left Honduras to work in the United States. The mother had told Susy that “[s]he was leaving in three days,” and that Susy and Jason would be going to live with their aunt “Estella.” Susy asserted that “[l]ife at Estella’s was miserable.” According to Susy, “Estella was physically violent and verbally abusive” toward her, as were Susy’s cousins. “Estella would smack [Susy] with whatever she could find, for no good reason at all,” and called her names, including telling Susy that she was a “whore.” Estella also used the money that Susy’s mother sent for Susy for Estella’s own family.
Susy averred that she had never lived with her father, Israel, whose last name she did not know. According to Susy, her mother said that the father was an alcoholic and violent toward the mother, and that they were “better off without him.” Susy indicated that she did not think that her father had ever supported her or her mother financially, and that her father “never was present in [her] life.” Although Susy indicated that she talked to her father “on the phone sometimes,” she stated that they were “not close.”
*103 In 2008, Susy arranged for herself and her younger brother to travel to the United States with the help of “coyotes” (smugglers), because “[l]ife with Estella was unbearable.” When Susy told her mother about this plan, her mother was initially “not happy at all with us coming to the United States,” but eventually “relented and asked her boyfriend to help pay for the trip.” Susy indicated that during the “very long trip,” they “traveled with different people and smugglers by bus and car,” and that they “had to sleep in strange places on the way.” She explained that when they arrived at the United States-Mexico border, they tried crossing, but the coyotes saw border patrol and ordered them to run away back toward Mexico. They crossed the border into the United States on their next attempt, but were pursued by the border patrol. “Everyone started running” in different directions, and Susy lost sight of Jason. When Susy heard that Jason had been picked up, she back-tracked so that he would not be alone, and she was detained by border patrol.
Susy and Jason were taken to a group home where they remained for about three days, and were then transferred to a foster home in Texas. After approximately 80 days, Susy’s uncle, Francisco G., arrived, and took Susy and her brother to New York to stay with Francisco and his family. Francisco enrolled Susy and Jason in school. With respect to her living situation, Susy explained as follows:
“At first it was hard adjusting to a new place and a new language but I now feel a lot more comfortable in the United States and I have friends. It is the first time I feel safe and taken care of as a child — it is a wonderful feeling to be provided for and be part of a loving family. I see my mother who lives close by with her boyfriend and their baby daughter but my caretaker and head of family is Francisco. I am happy living with him and his family.”
The Guardianship Petition and Motion for Special Findings On or about December 17, 2009, Francisco, who resided in Westchester County, filed a petition seeking his appointment as Susy’s guardian. The petition alleged, among other things, that Susy’s birth parents, although living, should not be appointed guardian of the person of the child, since the father had never been a part of her life and had never provided for her, and the mother had abandoned Susy in Honduras along with her younger brother Jason. Susy submitted a form indicating that she was more than 14 years of age and expressing a preference for the appointment of her uncle Francisco as her guardian.
*104 In December 2009, Francisco also filed a petition to be appointed guardian of Susy’s younger brother, Jason.
On or about December 23, 2009, Susy moved for the issuance of an order making the requisite declaration and specific findings that would allow her to apply to the United States Citizenship and Immigration Services for special immigrant juvenile status pursuant to 8 USC § 1101 (a) (27) (J). In support of the motion, Susy alleged that she was under 21 years of age, unmarried, and dependent upon the Family Court in that the court had accepted jurisdiction over the matter of her guardianship, and her parents had effectively relinquished control over her. Additionally, Susy maintained that reunification with one or both of her parents was not viable due to neglect and abandonment. Specifically, Susy alleged that her father had abandoned her and had not provided any financial support or parental guidance. In addition, Susy asserted that her mother had neglected her by failing to provide her with adequate food, clothing, shelter, and education in Honduras, and by allowing her to travel unaccompanied to the United States. Lastly, she alleged that her mother had abandoned her by failing to provide her with any substantial financial assistance or provisions since she arrived in the United States.
In support of her motion, Susy submitted her affidavit and birth certificate, as well as her brother’s affidavit. In addition, Susy submitted an affidavit from her mother. In her affidavit, the mother averred that Susy’s father, Israel, “never was responsible — he drank, used drugs, and was violent towards [the mother], even breaking [her] nose once.” The mother asserted that the father had “never been involved in [Susy’s] life,” and had also “never shown an interest in being involved in [the child’s] life, or offered to pay for her expenses in any way.” The mother also indicated that her former boyfriend, Jason’s father, had “beat[en]” the child.
The mother stated that when she lived in Honduras, she had relied on her sister Estella to take care of her children while she worked. She was aware that Estella had hit Susy, and that Estella would deprive the child of meals as a punishment. The mother indicated that she “continued to have Estella take care of [Susy] because [she] had no other choice.”
The mother acknowledged having left her children in the care of Estella when she left Honduras and immigrated to the United States in 2004. The mother stated that after she left Honduras, “Susy related on several occasions that Estella beat her *105 frequently and permitted her daughters to hit her as well. She also told [the mother] that Estella would frequently not feed [Susy and Jason], and only provided them with one meal a day on average.” The mother indicated that she sent money to Estella to pay for room and board for the children, and to cover expenses such as medical bills for Jason and school clothes.
According to the mother, in 2008, Susy informed her that she had contacted a “coyote” about transporting her and Jason to the United States. “Although [the mother] did not want them to come to the United States,” she “was afraid [Susy] otherwise would run away from home,” so she “agreed to speak to the coyote and pay him to bring Jason and Susy to the United States.” The mother ultimately learned from immigration authorities that the children had been arrested. The mother noted that her brother-in-law, Francisco, agreed to pick up the children in Texas and bring them back to live with him and his family. The mother asserted that she currently lived with her youngest daughter in a small apartment in the same town as Francisco, and that she did not have the resources to support Susy or Jason. She indicated that the children were “very happy” living with Francisco and his family, and that she wanted them “to stay with their Aunt and Uncle,” noting that “it [was] much better for them than to be with [her].”
In further support of her motion for an order of special findings, Susy submitted a letter from a licensed clinical social worker, Maribel Rivera, dated December 9, 2009. Rivera stated that Susy was attending individual psychotherapy sessions, and had been diagnosed with post-traumatic stress disorder and “depressed mood due to multiple changes in her life.” Susy also submitted a “Record of Deportable/Inadmissible Alien” document issued by the United States Department of Homeland Security, which reflected, inter alia, that Susy was apprehended on August 19, 2008, at or near Rio Grande City, Texas.
The Mother’s Custody Petition
Although the mother had initially supported Francisco’s application for guardianship of Susy, in May 2011, the mother filed a petition for custody of Susy. The mother indicated that she resided in Westchester County, and that it would be in Susy’s best interests to have custody awarded to her because the father was not involved in the child’s life, and the child “want[ed] to live with [the] mother.” The mother also submitted a memorandum of law in support of Susy’s motion for special findings.
*106 The Family Court’s Determination
At a court appearance on June 21, 2011, the Family Court, inter alia, granted the mother’s petition for sole custody of Susy and, as a result, dismissed Francisco’s petition for guardianship of the child. In addition, the court denied Susy’s motion for a special findings order. Counsel for the mother argued that because Susy had been neglected by her father, she was eligible for special findings under “the new law” even though the mother obtained custody. The court responded, “I think that is a strained reading of a statute. I think that it is a bending over more than backwards in order to create an artificial citizenship, frankly, and I will not make a special finding.” The court indicated that Susy was “with her natural parent,” and that she “doesn’t need them both.”
On September 13, 2011, the Family Court issued an order granting the mother’s petition for custody, denying Susy’s motion for a special findings order, and reciting that Francisco withdrew his guardianship petition.
Special Immigrant Juvenile Status
On appeal, Susy and the mother contend that the Family Court erred in denying Susy’s motion for an order of special findings on the basis that custody was awarded to the mother. They argue that the court’s determination was contrary to the plain language of the special immigrant juvenile status (hereinafter SIJS) statute, which permits SIJS eligibility where, as here, reunification is not viable with one of the child’s parents. Additionally, Susy and her mother contend that Susy satisfied the other eligibility requirements for SIJS and, therefore, Susy’s motion should have been granted.
The SIJS provisions of the Immigration and Nationality Act were enacted by Congress in 1990 (see 8 USC § 1101 [a] [27] [J], as added by Pub L 101-649, § 153, 104 US Stat 4978; Matter of Hei Ting C., 109 AD3d 100 [2013]; see also Yeboah v United States Dept. of Justice, 345 F3d 216, 221 [3d Cir 2003]; Perez-Olano v Gonzalez, 248 FRD 248, 252 [CD Cal 2008]). Under the statute, immigrant juveniles, or any person acting on their behalf (see 8 CFR 204.11 [b]), may petition the United States Citizenship and Immigration Services (hereinafter USCIS)[1] for SIJS (see Matter of Hei Ting C., 109 AD3d at 102-103; see also *107 Perez-Olano v Gonzalez, 248 FRD at 253). To be eligible for SIJS, an immigrant juvenile must obtain an order from a state juvenile court making findings that the juvenile satisfies certain criteria (see 8 CFR 204.11 [d]; Perez-Olano v Gonzalez, 248 FRD at 253). Once the state court makes an SIJS predicate order, a juvenile may apply to the USCIS for SIJS using an 1-360 petition, and if the juvenile is granted SIJS, he or she may be considered for adjustment to lawful permanent resident status (see Perez-Olano v Gonzalez, 248 FRD at 253; In re Y.M., 207 Cal App 4th 892, 910, 144 Cal Rptr 3d 54, 67-68 [2012]; see also 8 CFR 204.11 [c] [7]).
At the time of the enactment of the statute in 1990, a state court’s SIJS predicate order was required to find that (1) the juvenile was dependent on a juvenile court located in the United States and had been deemed eligible for long-term foster care, and (2) it would not be in the juvenile’s best interest to be returned to the juvenile’s or parent’s home country (see Pub L 101-649, § 153, 104 US Stat 4978, 5005-5006; Gao v Jenifer, 185 F3d 548 [6th Cir 1999]; Perez-Olano v Gonzalez, 248 FRD at 265; Matter of Hei Ting C., 109 AD3d at 102-103; Matter of Mario S., 38 Misc 3d 444, 449 [Fam Ct, Queens County 2012]). In 1997, Congress amended the law out of concern that juveniles entering the United States as visiting students were abusing the SIJS process (see Yeboah v United States Dept. of Justice, 345 F3d at 221; Perez-Olano v Gonzalez, 248 FRD at 265 n 10; My Xuan T. Mai, Children under the Radar: The Unique Plight of Special Immigrant Juveniles, 12 Barry L Rev 241, 246 [spring 2009]). The amendments modified the SIJS definition to include an immigrant whom a juvenile court had “legally committed to, or placed under the custody of, an agency or department of a State,” and added the requirement that the finding of eligibility for long-term foster care be “due to abuse, neglect, or abandonment” (Pub L 105-119, § 113, 111 US Stat 2440, 2460 [105th Cong, 1st Sess, Nov. 26, 1997]; see Matter of Hei Ting C., 109 AD3d at 103; 3-35 Immigration Law and Procedure § 35.09 [1] [Matthew Bender 2013]). Congress also added consent provisions, requiring the express consent of the United States Attorney General to the dependency order, and providing that no juvenile court had jurisdiction to determine the custody status or placement of a juvenile in the actual or constructive custody of the Attorney General unless the Attorney General specifically *108 consented to such jurisdiction (see Pub L 105-119, § 113, 111 US Stat 2440, 2460; M.B. v Quarantillo, 301 F3d 109, 114 [3d Cir 2002]; F.L. v Thompson, 293 F Supp 2d at 90). According to the House Conference Report, the modifications in the statute were made “in order to limit the beneficiaries of this provision to those juveniles for whom it was created, namely abandoned, neglected, or abused children” (HR Rep 105-405, 105th Cong, 1st Sess at 130, reprinted in 1997 US Code Cong & Admin News at 2941, 2954; see Yeboah v United States Dept. of Justice, 345 F3d at 222; Matter of Hei Ting C., 109 AD3d at 103).
In 2008, the requirements for SMS were again amended, this time by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (see Pub L 110-457, 122 US Stat 5044 [110th Cong, 2d Sess, Dec. 23, 2008]). The 2008 amendments expanded eligibility to include those immigrant children who had been placed in the custody of an individual or entity appointed by a state or juvenile court (see Pub L 110-457, 122 US Stat 5044, 5079; Matter of Hei Ting C., 109 AD3d at 103-104). Congress also removed the requirement that the immigrant child had to be deemed eligible for long-term foster care due to abuse, neglect, or abandonment, and replaced it with a requirement that the juvenile court find that “reunification with 1 or both of the immigrant’s parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law” (Pub L 110-457, 122 US Stat 5044, 5079; see Matter of Hei Ting C., 109 AD3d at 104; Matter of Mario S., 38 Misc 3d at 449). The amendments also modified the consent requirement by deleting the language requiring the Attorney General to “expressly consentí ] to the dependency order,” and replacing it with, “the Secretary of Homeland Security consents to the grant of special immigrant juvenile status” (Pub L 110-457, 122 US Stat 5044, 5079).[2]
Thus, under the current law, a “special immigrant” is a resident alien who is under 21 years of age, unmarried, and dependent on a juvenile court located in the United States or “legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a *109 State or juvenile court located in the United States” (8 USC § 1101 [a] [27] [J] [i]; see 8 CFR 204.11;[3] Matter of Hei Ting C., 109 AD3d at 103-104; Matter of Mario S., 38 Misc 3d at 450-451; see also In re J.J.X.C., 318 Ga App 420, 424, 734 SE2d 120, 123 [2012]). Additionally, the court must find that “reunification with 1 or both of the immigrant’s parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law,” and “that it would not be in the alien’s best interest to be returned to the alien’s or parent’s previous country of nationality or country of last habitual residence” (8 USC § 1101 [a] [27] [J] [i], [ii]; see Matter of Hei Ting C., 109 AD3d at 104; Matter of Nirmal S. v Rajinder K., 101 AD3d 1130, 1131 [2012]; Matter of Mohamed B., 83 AD3d 829, 831 [2011]; Matter of Trudy-Ann W. v Joan W., 73 AD3d 793, 795 [2010]).
By making these preliminary factual findings, the juvenile court is not rendering an immigration determination (see In re Welfare of D.A.M., 2012 WL 6097225, *2, 2012 Minn App Unpub LEXIS 1158, *5 [2012]; In re J.J.X.C., 318 Ga App at 424-425, 734 SE2d at 123; 3-35 Immigration Law and Procedure § 35.09 [3] [a] [Matthew Bender 2013]). Rather, “the final decision regarding [SIJS] rests with the federal government, and, as shown, the child must apply to that authority” (In re J.J.X.C., 318 Ga App at 424-425, 734 SE2d at 123; see 8 USC § 1101 [a] [27] [J] [iii]).
Analysis
In the present case, we find that the Family Court erred in denying Susy’s motion for the issuance of an order making a declaration and specific findings that would allow her to apply to the USCIS for SIJS. The record establishes that Susy is under 21 years of age and unmarried (see 8 CFR 204.11 [c] [1], [2]). Additionally, since the Family Court placed Susy in the custody of her mother, she has been “legally committed to, or placed under the custody of ... an individual . . . appointed by a State or juvenile court located in the United States[4]” (8 USC § 1101 [a] [27] [J] [i]; see Matter of Ashley W. [Verdele F.], 85 *110 AD3d 807, 809 [2011]; Matter of Jisun L. v Young Sun P., 75 AD3d 510, 512 [2010]; cf. Matter of Hei Ting C., 109 AD3d at 103-104).
With respect to the nonviability of reunification with one or both parents, the record reveals that Susy was abandoned by her father. Susy averred in her affidavit that she never lived with her father, and that she did not think he ever provided financial support. Although Susy indicated that she talked to her father “on the phone sometimes,” she asserted that he had never been present in her life. Susy’s mother confirmed in her affidavit that the father was never involved in Susy’s life. According to the mother, the father “never was responsible — he drank, used drugs, and was violent towards [her],” and “had never shown an interest in being involved in Susy’s life, or offered to pay for her expenses in any way.” Thus, Susy established that reunification with her father was not viable due to abandonment (see 8 USC § 1101 [a] [27] [J] [i]; Matter of Mohamed B., 83 AD3d at 832). The Family Court, as evidenced by its comments at the hearing, denied Susy’s application for a special findings order on the ground that the viability of reunification with Susy’s mother rendered Susy ineligible for SIJS. However, we disagree with the Family Court’s interpretation of the reunification component of the statute.
“To interpret a statute, we first look to its plain language, as that represents the most compelling evidence of the Legislature’s intent” (Matter of Tompkins County Support Collection Unit v Chamberlin, 99 NY2d 328, 335 [2003]; see Brown v Maple3, LLC, 88 AD3d 224, 231 [2011]; Matter of Richardson v Richardson, 80 AD3d 32, 37 [2010]). Under the plain language of the statute, to be eligible for SIJS, a court must find that “reunification with 1 or both of the immigrant’s parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law” (8 USC § 1101 [a] [27] [J] [i] [emphasis added]). We interpret the “1 or both” language to provide SIJS eligibility where reunification with just one parent is not viable as a result of abuse, neglect, abandonment, or a similar state law basis (see In re Welfare of D.A.M., 2012 WL 6097225, *3, 2012 Minn App Unpub LEXIS 1158, *8-9 [2012] [“A possibility of reunification with one parent does not bar SIJS eligibility. Rather, even when reunification with one parent is viable, courts *111 must determine the viability of reunification with the other parent”]; Angie Junck, Special Immigrant Juvenile Status: Relief for Neglected, Abused, and Abandoned Undocumented Children, 63 Juv & Fam Ct J 48, 56 [winter 2012] [“The ‘one or both parents’ language . . . signifies that the child need not be separated from both parents to be eligible for SIJS,” and permits SIJS eligibility “even while the child remains in the care of the other parent or while the court is actively trying to reunite the child with the other parent”]; 3-35 Immigration Law and Procedure § 35.09 [3] [a] [Matthew Bender 2013]). Thus, contrary to the Family Court’s determination, the fact that the mother was available as a custodial resource for Susy does not, by itself, preclude the issuance of special findings under the SIJS statute (see Matter of Mario S., 38 Misc 3d at 454 [“Although respondent was able to be returned to the custody of his mother upon his discharge from agency custody and the jurisdiction of the Family Court, he was both dependent upon the Family Court and abandoned by his biological father at the time of the motion. The fact that respondent was returned to the care of his mother should not be determinative of his application for SIJ findings”]; see also Matter of E.G., 24 Misc 3d 1238[A], 2009 NY Slip Op 51797[U], *3 [Fam Ct, Nassau County 2009] [“in light of the recent amendment to 8 USC § 1101 (a) (27) (J), a child may petition for SIJS even if there is a fit parent living abroad, so long as the minor has been abused, neglected or abandoned by one parent”]).
The legislative history of the SIJS statute supports this interpretation of the reunification requirement (see Matter of Tompkins County Support Collection Unit v Chamberlin, 99 NY2d at 335 [“the legislative history of an enactment may also be relevant and is not to be ignored, even if words be clear” (internal quotation marks omitted)]). As set forth above, prior to the 2008 amendments, the statute required a determination that the child was eligible for long-term foster care (see Pub L 105-119, § 113, 111 US Stat 2440, 2460). The phrase “[eligible for long-term foster care” meant a determination “by the juvenile court that family reunification is no longer a viable option” (8 CFR 204.11 [a]). Thus, under the former version of the statute, “SIJS was only available when reunification with both parents was not possible” (In re Welfare of D.A.M., 2012 WL 6097225, *3, 2012 Minn App Unpub LEXIS 1158, *9 [2012]). “[B]y eliminating the long-term foster-care requirement and instead requiring only a finding that ‘reunification with 1 or both’ parents is not viable,” the statute, as amended in 2008, “requires only a finding *112 that reunification is not viable with one of the child’s parents” (2012 WL 6097225, *4, 2012 Minn App Unpub LEXIS 1158, *10 [emphasis omitted], quoting Pub L 110-457, 122 US Stat 5044).
The expansion in the definition of SIJS to allow a juvenile court to consider the nonviability of family reunification with just one parent, rather than both, permits “more vulnerable and mistreated children to qualify for this form of legal relief” (Deborah Lee et al., Practice Advisory, Update on Legal Relief Options for Unaccompanied Alien Children Following the Enactment of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 at 4 [Feb. 19, 2009], available at http://www.ilrc.org/files/235_tvpra_practice_advisory.infonet .pdf). Notably despite the expansion in SIJS eligibility under the 2008 amendments, the number of immigrant youths who have obtained lawful permanent residency through SIJS has remained relatively low when compared to the total number of immigrants under age 21 who have obtained lawful permanent residency since 2008 (see Department of Homeland Security, Yearbooks of Immigration Statistics, 2009-2012 [Tables 7-8], available at http://www.dhs.gov/yearbook-immigration-statistics; see also Angie Junck, Special Immigrant Juvenile Status: Relief for Neglected, Abused, and Abandoned Undocumented Children, 63 Juv & Fam Ct J at 52 [“SIJS was created over 20 years ago, but it is still an underused form of immigration relief’]; Kristen Jackson, Special Status Seekers: Through the Underused SIJS Process, Immigrant Juveniles May Obtain Legal Status, 34 Los Angeles Lawyer 20, 22 [Feb. 2012], available at http:// www.lacba.org/Files/LAL/Vol34Noll/2893.pdf [stating, with respect to the 2010 statistics, that “(r)ather than a flood anticipated by some SIJS detractors, the number of SIJS grantees has been only a trickle”]). In 2012, of the 258,554 immigrants under age 21 who obtained lawful permanent residency only 2,280, or less than one percent, did so through SIJS (see Department of Homeland Security, Yearbook of Immigration Statistics: 2012 Legal Permanent Residents [Tables 7-8], available at http://www.dhs.gov/yearbook-immigration-statistics2012-legal-permanent-residents).
We note while we find a literal reading of the phrase “1 or both” to be supported by the plain language of the statute, the Supreme Court of Nebraska has declined to adopt a literal reading of the phrase (see In re Erick M., 284 Neb 340, 352, 820 NW2d 639, 648 [2012]). In Erick M., the court found the phrase “1 or both” to be ambiguous because it can reasonably be *113 interpreted “to mean that a juvenile court must find, depending on the circumstances, that either reunification with one parent is not feasible or reunification with both parents is not feasible” (In re Erick M., 284 Neb at 345, 820 NW2d at 644). After holding that courts “should generally consider whether reunification with either parent is feasible,” the Erick M. court determined that the petitioner therein was not eligible for SIJS predicate findings because reunification with his mother was feasible (248 Neb at 341, 352, 820 NW2d at 642, 648).
Initially, to the extent the language of the statute can indeed be viewed as ambiguous, it has been held that “ambiguities in immigration statutes must be read in favor of the immigrant” (Yu v Brown, 92 F Supp 2d 1236, 1248 [D NM 2000], citing INS v Cardoza-Fonseca, 480 US 421, 449 [1987] [noting “the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien”]). In any event, for the reasons discussed, we decline to adopt the Nebraska Supreme Court’s interpretation of the statute. Absent a grant of special findings in this case, Susy might face deportation to Honduras where her father has abandoned her and there appear to be no other fit relatives to care for her, essentially rendering the fact that the child has a fit parent in the United States immaterial. We believe this would be contrary to the purpose of the SIJS statute. “Indeed, the very reason for the existence of special immigrant juvenile status is to protect the applicant from further abuse or maltreatment by preventing him or her from being returned to a place where he or she is likely to suffer further abuse or neglect” (Matter of Sing W.C. [Sing Y.C. — Wai M.C.], 83 AD3d 84, 91 [2011] [internal quotation marks omitted]).
Moreover, and indeed significantly, the findings by the state juvenile court “do not bestow any immigration status on SIJS applicants” (In re Welfare of D.A.M., 2012 WL 6097225, *2, 2012 Minn App Unpub LEXIS 1158, *5 [2012]), but, instead, are prerequisites to applying for SIJS classification with the USCIS (see id.; In re J.J.X.C., 318 Ga App at 424-425, 734 SE2d at 123-124; 3-35 Immigration Law and Procedure § 35.09 [3] [a] [Matthew Bender 2013] [noting that “in refusing to make SIJ findings where one parent was present, the Nebraska court blurred the federal and state roles under the SIJ statute,” and that “(t)he decision has the troubling effect of precluding the USCIS from applying its interpretation of the federal statute to determine whether a youth would qualify in a particular case”]). *114 As discussed above, the Secretary of Homeland Security ultimately must consent to the grant of SIJS (see 8 USC § 1101 [a] [27] [J] [iii]).
“The consent determination by the Secretary, through the USCIS District Director, is an acknowledgement that the request for SIJ classification is bona fide. This means that the SIJ benefit was not ‘sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect or abandonment’ ” (Mem of Donald Neufeld, USCIS Acting Associate Director, Domestic Operations, to Field Leadership, Trafficking Victims Protection Reauthorization Act of 2008: Special Immigrant Juvenile Status Provisions at 3 [Mar. 24, 2009], quoting HR Rep 105-405, 105th Cong, 1st Sess at 130 [1997], available at http://www.uscis.gov/sites/default/files/USCIS/Laws/ Memoranda/Static_Files_Memoranda/2009/ TVPRA_SIJ.pdf).
Thus, the USCIS ultimately “determines whether the applicant meets the requirements for SIJS under federal law,” and “[i]ts decision whether to grant SIJS is discretionary” (In re Welfare of D.A.M., 2012 WL 6097225, *2, 2012 Minn App Unpub LEXIS 1158, *5 [2012]; see Matter of Mario S., 38 Misc 3d at 456 [“Whether or not a juvenile’s application constitutes a potential abuse or misuse of the SIJ provisions of the immigration law is an issue to be determined by the USCIS”]). Indeed, the USCIS has approved SIJS applications where reunification with one parent was viable (see 3-35 Immigration Law and Procedure § 35.09 [3] [a] [Matthew Bender 2013]; Angie Junck, Special Immigrant Juvenile Status: Relief for Neglected, Abused, and Abandoned Undocumented Children, 63 Juv & Fam Ct J at 56). In sum, we find that Susy has satisfied the statute’s reunification requirement by demonstrating that reunification with her father was not viable.
Turning to the best interests component, as discussed, the record shows that the father, who apparently continues to live in Honduras, abandoned Susy. Additionally, Susy’s aunt, Estella, with whom she previously lived in Honduras, was neglectful and abusive toward her. The mother stated that she had left Susy with Estella because she had no other alternative, which indicates that there are no other relatives available to care for Susy in Honduras. The record also reveals that the child has suffered psychological distress. By contrast, the record demon *115 strates that in the United States, Susy is attending school, has made friends, and has family members to care for her, including her mother, as well as her uncle and aunt. Under these circumstances, the record demonstrates that it would not be in the best interests of the child to return to Honduras (see Matter of Alamgir A., 81 AD3d 937, 940 [2011] [finding that it was in the best interests of the child to continue living in the United States where the record reflected that in the child’s native country of Bangladesh, he “would have nowhere to live, and no means of supporting himself”]; Matter of Trudy-Ann W. v Joan W., 73 AD3d at 796).
Finally, it is not necessary to remit the matter for a hearing on Susy’s application. “[W]here, as here, the record is sufficiently complete for us to make our own factual determinations, we may do so” (Matter of Trudy-Ann W. v Joan W., 73 AD3d at 795 [internal quotation marks and citation omitted]; see Matter of Alamgir A., 81 AD3d at 938-939; Matter of Jisun L. v Young Sun P., 75 AD3d at 511-512). Therefore, based on the foregoing, we find that the Family Court erred in denying Susy’s motion for the issuance of an order making a declaration and specific findings that would allow her to apply to the USCIS for SUS.
Accordingly, the order is reversed insofar as appealed from, on the law and the facts, the motion is granted, it is declared that Susy is dependent on the Family Court, and it is found that she is unmarried and under 21 years of age, that reunification with one or both of her parents is not viable due to parental abuse, neglect, and abandonment, and that it would not be in Susy’s best interests to return to Honduras, her previous country of nationality and last habitual residence.
Rivera, J.E, Dickerson and Leventhal, JJ., concur.
Ordered that the order is reversed insofar as appealed from, on the law and the facts, without costs or disbursements, the motion is granted, it is declared that Susy M.-G. is dependent on the Family Court, and it is found that Susy M.-G. is unmarried and under 21 years of age, that reunification with one or both of her parents is not viable due to parental abuse, neglect, and abandonment, and that it would not be in the best interests of Susy M.-G. to return to Honduras, her previous country of nationality and last habitual residence.

. The Homeland Security Act of 2002 (6 USC § 101 et seq., as added by Pub L 107-296, 116 US Stat 2153), abolished the Immigration and Naturalization Service, and created the Department of Homeland Security (hereinafter the DHS). The USCIS, an agency within the DHS, assumed responsibility for *107 the administration of SIJS benefit applications (see Perez-Olano v Gonzalez, 248 FRD at 253 n 2; F.L. v Thompson, 293 F Supp 2d 86, 91 [D DC 2003]).

. With respect to those juveniles in federal custody, the statute, as amended, provides that “no juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction” (8 USC § 1101 [a] [27] [J] [iii] [I]).

. The federal regulations have not been updated to reflect the 2008 amendments to the SIJS statute (see 76 Fed Reg 54978 [2011], to be codified at 8 CFR parts 204, 205, 245; In re Welfare of D.A.M., 2012 WL 6097225, *3 n 1, 2012 Minn App Unpub LEXIS 1158, *9-10 n 1 [Ct App, Dec. 10, 2012, No. A12-0427]).

. We note that this Court’s recent decision in Matter of Hei Ting C. (109 AD3d 100 [2013]), does not address the issue raised here. In Matter of Hei Ting C., this Court held that a child support order does not satisfy the requirement in the SIJS statute that a child be “ ‘dependent on a juvenile court’ ” *110 (id. at 102, quoting 8 USC § 1101 [a] [27] [J] [i]). By contrast, the present case, which involves a custody order, primarily concerns the interpretation of the statutory term “1 or both” (8 USC § 1101 [a] [27] [J] [i]).