8 A.3d 260

D.C., PLAINTIFF, v. A.B.C., DEFENDANT.

IN THE MATTER OF P.C., A MINOR.

Superior Court of New Jersey
Chancery Division Family Part Monmouth County

Decided June 30, 2010.

42

*Barbara Camacho* for plaintiff and minor child (American Friends Service Committee).

GUADAGNO, P.J.F.P.

Plaintiff D.C. ("Dianne")[1] commenced this action for custody of the minor child, P.C., ("Paul"), pursuant to *N.J.S.A.* 9:6–1 and

---

[1] The names used in this opinion are fictitious to protect the privacy of the minor.

*N.J.S.A.* 9:6–8.9(d), alleging that Paul was abused, neglected, and abandoned by his mother, defendant, A.B.C. ("Allison"). Paul is a Guatemalan national who entered the United States illegally in December 2008 when he was fourteen years old. Paul now resides with plaintiff and her husband, M.P.C. ("Mark"), who is Paul's biological father. Dianne also seeks to have this court make findings that:

1. Reunification of Paul with his mother is not viable due to neglect and abandonment; and

2. It is not in Paul's best interest to be returned to Guatemala, the country of his birth.

During argument on her motion, plaintiff's counsel explained that these findings are necessary for Paul to qualify for special immigrant juvenile status pursuant to 8 *U.S.C.A.* § 1101(a)(27)(J) and 8 *C.F.R.* § 204.11.

## I.

In attachments to her motion, Dianne provides Paul's birth certificate, which indicates that he was born in 1993, in Guatemala. In a certification submitted in support of plaintiff's motion, Paul alleges that his father "left me and my mother when I was a newborn." Paul stopped going to school in the fourth grade in order to do construction work because his mother could not provide him with "clothes or lunch money for school."

Without providing any detail as to how he entered the United States, Paul's certification states only that in December 2008, "I was detained by U.S. Immigration and I was held in a youth shelter in Arizona." He then states that, "A worker at the detention center called [Dianne] and she provided the necessary documents so I could be released."

## II.

On May 10, 2010, this court conducted a hearing on plaintiff's application. Plaintiff's counsel called Paul as a witness. He testified that he currently lives in Freehold with his father and

plaintiff, who he referred to as his step-mother. He stated that his mother mistreated him in Guatemala by not providing him with an education or enough food to eat. He began working a construction job at age twelve from eight a.m. to five p.m., six days a week.

He explained that he entered the United States by crossing the border in a car and then "walked in the desert for two days." During this time period he relied on others in his group for food and water.

Since arriving in this country he has enrolled in high school where he plays soccer. He is treated well by his father and step-mother and wants to remain with them in this country.

Upon questioning by the court, Paul stated that his mother made the arrangements for him to come to this country, and it was her intention to reunite him with his father. When he was detained in Arizona, plaintiff, who he had never met before, came to Arizona to pick him up.

The court, *sua sponte*, then called Dianne as a witness. She testified that she married Mark in March 2009, after knowing him for about a year. At the time of their marriage, she was eight months pregnant with Mark's child. She had heard about Paul but claimed that she did not know he was coming to the United States. She testified that defendant agreed to pay $3000 to have Paul smuggled into this country but speculated that she might not have had to pay, as Paul was caught shortly after entering.

She did not know the source of the money that was paid to the smugglers, whom she referred to as "coyotes," but believes it came from defendant's brother, who resides in the United States.

## III.

■ The *Immigration and Nationality Act*, 8 *U.S.C.A.* § 1101(a)(27)(J) (2006); 8 *C.F.R.* § 204.11 (2008), gives undocumented children, under the jurisdiction of a juvenile court, the ability to petition for special immigrant juvenile status in order to

obtain lawful permanent residence in the United States. Paul is seeking to be classified as a special immigrant juvenile, which would enable him to remain in the United States.

The relevant portion of 8 *U.S.C.A.* § 1101(a)(27)(J) defines "special immigrant" as an "immigrant who is present in the United States":

i. Who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

ii. For whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence . . .

In order to be eligible for special immigrant status, the requirements of 8 *C.F.R.* § 204.11(c) must be met. That section provides that an alien is eligible for classification as a special immigrant under section 101(a)(27)(J) of the Act if the alien:

(1) Is under twenty-one years of age;

(2) Is unmarried;

(3) Has been declared dependent upon a juvenile court located in the United States in accordance with state law governing such declarations of dependency, while the alien was in the United States and under the jurisdiction of the court;

(4) Has been deemed eligible by the juvenile court for long-term foster care;

(5) Continues to be dependent upon the juvenile court and eligible for long-term foster care, such declaration, dependency or eligibility not having been vacated, terminated, or otherwise ended; and

(6) Has been the subject of judicial proceedings or administrative proceedings authorized or recognized by the juvenile court in which it has been determined that it would not be in the alien's best interest to be returned to the country of nationality or last habitual residence of the beneficiary or his or her parent or parents; or

(7) On November 29, 1990, met all the eligibility requirements for special immigrant juvenile status in paragraphs (c)(1) through (c)(6) of this section, and for whom a petition for classification as a special immigrant juvenile is filed on Form I–360 before June 1, 1994.

[8 *C.F.R.* 204.11(c).]

Paul is now sixteen years old and unmarried. Whether he is dependent upon a juvenile court depends upon whether it is necessary for this court to intercede because his parents are unfit, have neglected him, or endangered his welfare. *See N.J.S.A.* 9:2–9. That section provides:

> When the parents of any minor child or the parent or other person having the actual care and custody of any minor child are grossly immoral or unfit to be intrusted with the care and education of such child, or shall neglect to provide the child with proper protection, maintenance and education, or are of such vicious, careless or dissolute habits as to endanger the welfare of the child or make the child a public charge, or likely to become a public charge; or when the parents of any minor child are dead or cannot be found, and there is no other person, legal guardian or agency exercising custody over such child; it shall be lawful for any person interested in the welfare of such child to institute an action in the Superior Court, Chancery Division, Family Part, in the county where such minor child is residing, for the purpose of having the child brought before the court, and for the further relief provided by this chapter. The court may proceed in the action in a summary manner or otherwise.

Under this section, any person interested in the welfare of a child may institute an action in the Superior Court, Chancery Division, Family Part, in the county where the minor child resides for the purpose of securing custody where the known parents are unable to care for the child. While it can be argued that Paul's mother is currently unable to care for him, as she is still in Guatemala, Paul has been reunited with his father and is thriving under his care. Plaintiff testified that Mark is working two jobs to help support the family. They live in Freehold and Paul attends Colts Neck High School where he is doing well. There is no evidence that Mark is not providing his son with "proper protection, maintenance and education," nor is there any likelihood that Paul is "likely to become a public charge."

Mark is not a party to this litigation for an obvious reason. Any action under *N.J.S.A.* 9:2–9 must be maintained by a third party and requires a showing that the parent having custody of the child is "grossly immoral or unfit." *Watkins v. Nelson,* 163 *N.J.* 235, 244, 748 *A.*2d 558 (2000); *See e.g., S.M. v. A.W.,* 281 *N.J.Super.* 63, 69, 656 *A.*2d 841 (App.Div.1995)(one parent was dead and the other could not be located). Mark, who enjoys *de facto* custody of

Paul, can not make such a showing. Also, plaintiff's application focuses solely on her claim that Paul's mother neglected and abandoned him. In taking this position, plaintiff ignores the fact that the child is thriving under his father's care. When the court questioned plaintiff as to why the court should award custody to her when the child's father, is providing for all of Paul's needs, she was nonplussed.

Nor has there been sufficient proof to show that Paul was abused or neglected while in his mother's custody or that her actions of arranging and financing his illegal entry into the United States constituted abandonment.

■ Abandonment requires a finding that a parent has willfully forsaken obligations, although physically and financially able to discharge those obligations. *N.J.S.A.* 30:4C–15(d); *In re Guardianship of J.C.,* 129 *N.J.* 1, 17, 608 *A.2d* 1312 (1992); *In re Guardianship of K.L.F.,* 129 *N.J.* 32, 39, 608 *A.2d* 1327 (1992). The parent must have engaged in a course of conduct that "evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re N.,* 96 *N.J.Super.* 415, 426, 233 *A.2d* 188 (App.Div.1967).

Here, Paul's mother, living in poverty, arranged to pay a smuggler $3000 to transport him into the United States to be reunified with his father. No rational view of this evidence can support the conclusion that defendant abandoned her son.

■ Similarly, the evidence fails to establish that defendant abused or neglected Paul while he lived with her in Guatemala. Title 9 controls the adjudication of abuse and neglect cases. An abused or neglected child is defined as:

> a child less than 18 years of age whose parent or guardian, as herein defined, (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any

bodily organ; ... (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

[*N.J.S.A.* 9:6–8.21(c)(1)–(2), (4).]

Paul claims that while in Guatemala, his mother was not able to provide him with adequate food, clothing, and education, although it is clear that this was not the result of intentional neglect but was caused by her inability to earn enough money to adequately support the family. Plaintiff's counsel recognizes the mother's well-intentioned efforts to provide for Paul in her brief when she stated "the defendant is unable to earn enough money for [Paul] cleaning houses or care for him properly, especially after developing arthritis. While in the fourth grade, [Paul] left school in order to work to contribute to the household."

In an attempt to provide a better life for her son, defendant secured funds in order to send Paul to the United States to live with his father. These are not the actions of an abusive or neglectful parent; instead, they describe a caring mother who is trying to provide better living conditions for her son.

Plaintiff also argues that defendant's actions in allowing Paul to begin working a construction job at age fourteen constituted abuse and neglect. Guatemala is one of the poorest countries in the world, with gross national income (GNI) *per capita* of less than $3000. *See International Monetary Fund, World Economic Outlook Database,* (April 2009). According to the United States Department of Labor, 88.1% of Guatemalan children are initially enrolled in primary school, which is free, but only 30% of them complete that level of education. Furthermore, about 15% of children between the ages of ten to fourteen are working.

Thus, leaving school to work in order to help support the family, as Paul did, is not uncommon in Guatemala. The minimum age for work in Guatemala is fourteen as a result of that country's adoption in 1990 of the *United Nations International Labor Organization (ILO) Convention 138, the Minimum Age Convention of 1973,* Ratified, April 27, 1990, available at *http://www.ilo. org/ilolex/english/newratframeE.htm. ILO Convention 138* sets forth minimum ages for different types of work in different nations at different stages of economic development. *Roe v. Bridgestone Corp.,* 492 *F.Supp.*2d 988, 1020–21 (S.D.Ind.2007). The United States has not ratified *ILO Convention 138, but has ratified the key source of international child labor standards, ILO Convention 182, the 1999 Convention Concerning the Prohibition and Immediate Elimination of the Worst Forms of Child Labor. International Labor Organization Convention 182, Art. 1,* available at *http://www.ilo.org/public/english/standards/relm/ilc/ilc87/ com-chic.htm. ILO Convention 182* does not seek to outlaw child labor as such, but only its "worst forms" including slavery, forced or compulsory labor, prostitution, production of pornography, and drug trafficking. The worst forms also include "work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children." *Ibid.*

Moreover, the Guatemalan Inspector General of Labor has authority to grant a work permit to a child less than fourteen if extreme poverty warrants the child's contribution to the family income. Government of Guatemala, *Código de Trabajo,* Article 150. *See United States Department of Labor, Bureau of International Labor Affairs, Guatemala, Article III,* available at *http:// www.dol.gov/ilab/media/reports/iclp/sweat/guatemala.htm.* It is clear from the certifications and Paul's testimony that the construction work he was performing in Guatemala was not the "worst form" of child labor prohibited by *Convention 182.* Nor was he, at age fourteen, working in violation of Guatemala's minimum age laws. There is no evidence presented that the construction work caused physical injury or created a substantial risk of death, or serious or protracted disfigurement to Paul. Thus,

Paul's work in a construction job at age 14 did not constitute abuse and neglect.

For a juvenile to qualify for special immigrant juvenile status, a court must find that reunification of the juvenile with one or both of the juvenile's parents is not viable due to parental abuse, neglect, abandonment, or similar parental conduct defined under state law, and that it would not be in the juvenile's best interest to be returned to his or her native country or country of last habitual residence. *See* 8 *U.S.C.* § 1101(a)(27)(J)(i) & (ii); 8 *C.F.R.* § 204.11(c)(6).

The "appointment of a guardian constitutes the necessary declaration of dependency on a juvenile court" for special immigrant juvenile status purposes. *Matter of Antowa McD.*, 50 *A.D.*3d 507, 856 *N.Y.S.*2d 576 (App.Div.2008). Plaintiff has not established that defendant abandoned, abused or neglected Paul and it is not necessary to appoint plaintiff as Paul's guardian as the child is thriving in the custody of his father. There is no need for this court to exercise jurisdiction and therefore Paul is not dependent on a juvenile court within the meaning of 8 *U.S.C.A.* § 1101(a)(27)(J).

■ Plaintiff is also seeking a finding that it is not in Paul's best interests to be returned to Guatemala. As the court is declining to exercise jurisdiction, such a finding would amount to an advisory opinion. Courts are cautioned not to render such opinions or to exercise jurisdiction in the abstract. *State v. Abeskaron,* 326 *N.J.Super.* 110, 117, 740 *A.*2d 690 (App.Div.1999), (citing *In re J.I.S. Indus. Serv. Co. Landfill,* 110 *N.J.* 101, 104, 539 *A.*2d 1197 (1988)), and *In re Requests to Judges of Chancery for Advisory Opinions,* 101 *N.J.Eq.* 9, 137 *A.* 151 (Ch.1927). Therefore, this court declines to address the best interests issue.