# Third District Court of Appeal

## State of Florida

Opinion filed January 13, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-1472
Lower Tribunal No. 15-15515
_____

**In the Interest of:**
**S.A.R.D., A minor child,**
Appellant.

An Appeal from the Circuit Court for Miami-Dade County, Cindy S. Lederman, Judge.

DLA Piper LLP, and Harout Jack Samra, for appellant.

Before SHEPHERD, ROTHENBERG, and FERNANDEZ, JJ.

ROTHENBERG, J.

S.A.R.D. appeals a final order dismissing his private petition for dependency entered on May 13, 2015, two days before S.A.R.D. reached the age of majority. Because the record supports the trial court's finding that S.A.R.D. was not abandoned, abused, or neglected by his mother, we agree that S.A.R.D. failed to

establish that he is a dependent child under Chapter 39, Florida Statutes (2015). Accordingly, we affirm.

The operative facts are as follows. S.A.R.D., who was born in Honduras on May 15, 1997, was seventeen years old when he illegally crossed the border between Mexico and the United States. He was just nine days shy of reaching the age of majority when he filed his petition for dependency on May 6, 2015, and he is now eighteen.

In his petition, S.A.R.D. alleges that when he was seven years old, over ten years ago, his father abandoned him. Since his father abandoned him, he has lived with his mother and maternal uncle, who cared and provided for him. When his uncle was murdered on December 26, 2012, S.A.R.D. continued to live with his mother, but at some point he began working on a coffee farm to subsidize his needs. In 2014, he left his mother and Honduras and illegally entered the United States. He is seeking an order of dependency under section 39.01, Florida Statutes (2015), on the basis of abandonment by his father and neglect by his mother in order to become eligible for a Special Immigrant Juvenile ("SIJ") status visa under 8 U.S.C. § 1101(a)(27)(J) of the Immigration and Nationality Act, and ultimately to obtain permanent immigration status in this country. S.A.R.D. is uneducated and he has only recently learned to write his own name by attending special classes in the United States.

# THE IMMIGRATION ACT OF 1990

The Immigration Act of 1990 ("the Act") created a category of "special immigrants" who are entitled to obtain permanent immigration status in this country. 8 U.S.C. § 1101(a)(27). One such category is for undocumented/illegal youths who are under protection of a state juvenile, family, or probate court. Id. at § 1101(a)(27)(J). To qualify for an SIJ visa, the minor must be a juvenile immigrant who is present in the United States and

> (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;
> (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and
> (iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status[.]

Id.

"The SIJ provisions of [the ACT] were enacted in 1990 to protect abused, neglected, or abandoned children who, with their families, illegally entered the United States." Yeboah v. United States Dep't of Justice, 345 F.3d 216, 221 (3d Cir. 2003). "Rather than being deported along with abusive or neglectful parents, or deported to parents who had abandoned them once in the United States, such

children may seek special status to remain in the United States." Id. However, when visiting students from other countries began abusing the Act to improve their immigration status, Congress amended subparagraph (J) in 1997 to require the juvenile to be deemed eligible for long-term foster care due to abuse, neglect, or abandonment. Id. at 222; see also 8 U.S.C. § 1101(a)(27)(J)(i). To be eligible for long-term foster care, the Act required a court or agency to find that it was not in the juvenile's best interests to return to his or her home country. 8 U.S.C. § 1101(a)(27)(J)(ii); 8 C.F.R. § 204.11(c)(6). Congress also amended the Act to require the United States Attorney General's consent to conduct an SIJ proceeding. 8 U.S.C. § 1101(a)(27)(J)(iii)(I).

In 2008, Congress eliminated the requirement that the child be eligible for long-term foster care, see 8 U.S.C.A. § 1101(a)(27)(J)(i), and added language requiring the inability of the child to be reunited with "1 or both" parents because of "abuse, neglect, abandonment, or a similar basis" under state law. Id.

Thus, the procedure provided for obtaining SIJ status is a two-step procedure. First, the child must petition a state juvenile court to obtain an order that makes findings that the child satisfied certain state dependency criteria. This order is a predicate before a child can submit his or her application for SIJ status. The juvenile court does not make an immigration determination. In re Marcelina M.-G. v. Israel S., 112 A.D. 3d 100, 109 (N.Y. App. Div. 2013). If the child

4

obtains an order finding him dependent in state juvenile court and obtains a best interest order, he can then apply for SIJ status, which, if obtained, will permit the child to apply for adjustment of status under 8 U.S.C.A. § 1255 in an effort to obtain legal permanent residency and, eventually, United States citizenship. 8 U.S.C.A. § 1255.

As the Third Circuit Court of Appeals noted in M.B. v. Quarantillo, 301 F.3d 109, 114 (3d Cir. 2002), "Being granted such status is, of course, quite advantageous to an alien." For example, SIJ status provides exemption from deportation on certain grounds, including for being present in the United States illegally. 8 U.S.C.A. § 1227(a)(1)(B-C). A juvenile granted SIJ status is deemed "to have been paroled into the United States" for purposes of discretionary adjustment of his status "to that of an alien lawfully admitted for permanent residence." 8 U.S.C.A. § 1255(a), (h)(1), and certain grounds of inadmissibility do not apply (including unlawful entry into the United States), and other grounds may be waived by the Attorney General. 8 U.S.C.A. § 1255(h)(2); 8 U.S.C.A. § 1182. As is obviously apparent, obtaining an order of dependency and SIJ status allows the child who entered the United States or stayed in the United States illegally to jump to the front of the line of those who are attempting to immigrate to the United States lawfully and to bypass many of the requirements established for regular legal immigration.

What is troubling about this bifurcated procedure is that, although it is clear that under our federal system the "[p]olicies pertaining to the entry of aliens and their rights to remain here are . . . entrusted exclusively to Congress," In the Interest of K.B.L.V., 176 So. 3d 297 (Fla. 3d DCA 2015) (Shepherd, J., specially concurring) (quoting Galvan v. Press, 347 U.S. 522, 531 (1954)), we are being asked to provide an initial stamp of approval to a child's request for SIJ status and permanent residency as if we are federal customs agents. And, because the matter is before the dependency court, the dependency court must base its decision, in part, on what is in the best interest of the child, as opposed to what is in the best interest of the country.

Even more troubling is the attempt to expand the stated purpose of the Act. As stated earlier, "[t]he SIJ provisions of [the ACT] were enacted in 1990 to protect abused, neglected, or abandoned children who, **with their families, illegally entered the United States.**" Yeboah, 345 F. 3d at 221. (emphasis added). These provisions allowed such children to seek SIJ special status to remain in this country "[r]ather than being **deported along with the abusive or neglectful parents,** or deported to parents who had abandoned them once **in the United States**." Id. (emphasis added). The purpose of the Act was not to provide exemption from deportation to children who leave their families and homes in other countries, with or without the encouragement and support of their families,

6

and illegally enter the United States without their parent(s) in search of a better life. That, however, is the scenario we are seeing in the current influx of dependency petitions filed by children who have entered the United States illegally.

The attempt to expand the stated purpose of the Act not only encourages parents to send their children to the United States and children to leave their families and homes to illegally enter the United States, it also places a very difficult burden upon the state courts tasked with reviewing these dependency petitions and making a dependency determination. A dependency petition which alleges abuse, abandonment, or neglect by a child's parent(s) requires investigation. Investigating such allegations stemming from alleged conduct in the United States, while challenging and costly, is possible. Investigating such allegations regarding parents living in another country is nearly impossible. Testing the veracity of an affidavit from a parent who sent or endorsed a child's exodus from his native country and family to seek a better life in the United States is equally nearly impossible. And yet, that is what the state courts are being asked to do.

## ANALYSIS

Although we have articulated the problems associated with petitions for dependency filed by children who leave their families for another country and

illegally enter the United States and are seeking SIJ Statutes, the instant petition was properly decided as a matter of law.

S.A.R.D. sought an adjudication of dependency pursuant to Chapter 39 of the Florida dependency statutes. Chapter 39 defines a dependent child, in part, as one who has been "abandoned, abused, or neglected" by the child's "parents or legal custodians." § 39.01(15)(a), Fla. Stat. (2015).

These petitions have become increasingly common and typically are filed just before the child, who illegally crossed the border into the United States, turns eighteen. Because this was a private petition, the Department of Children and Families ("DCF") declined to involve itself in any of the proceedings and no testimony or opposing argument was presented to the trial court.[1] The child does not seek any services from the State. Thus, the petition was not subjected to a true adversarial proceeding at the trial court level, and this Court was not presented with opposing argument or analysis on appeal. As the Fourth District Court of Appeal correctly noted in O.I.C.L. v. Department of Children & Families, 169 So. 3d 1244, 1247 (Fla. 4th DCA 2015), review granted, SC15-1570 (Fla. Oct. 30, 2015), "[a]t their core, these petitions are probably best described as merely an unopposed request for assistance of the court for entry of orders to help a child obtain legal immigration status." (internal quotation omitted).

---

[1] Although generally DCF had declined to participate in these private dependency proceeding, it now appears that DCF is beginning to participate in these cases.

8

After reviewing the petition, the trial court in the instant case denied S.A.R.D.'s dependency petition. "A trial court's discretion in child welfare proceedings is very broad." O.I.C.L., 169 So. 3d at 1247. Because a trial court's ruling on a dependency petition is a mixed question of law and fact, we review findings of fact for competent substantial evidence, E.R. v. Dep't of Children & Families, 143 So. 3d 1131, 1134 (Fla. 4th DCA 2014), and we review the trial court's interpretation of the law de novo. See C.R. v. Dep't of Children & Family Servs., 53 So. 3d 240, 242 (Fla. 3d DCA 2010); G.C. v. Dep't of Children & Families, 791 So. 2d 17, 19 (Fla. 5th DCA 2001).

In his petition, S.A.R.D. alleged that he was abandoned by his father at the age of seven and neglected by his mother at some point after December 2012. We address each ground in turn.

## A. Abandonment by S.A.R.D.'s father

Section 39.01(1), Florida Statutes (2015), defines "abandonment" as:

[A] situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the caregiver, while being able, has made no significant contribution to the child's care and maintenance or has failed to establish or maintain a substantial and positive relationship with the child, or both.

S.A.R.D. contends that abandonment by his father is undisputed. As already noted above, however, S.A.R.D.'s petition was not subjected to an adversarial proceeding because he filed a private petition, sought no services from the State,

9

and DCF was not involved.  We conclude, however, that even if the allegations are treated as true, the trial court correctly declined to adjudicate S.A.R.D. dependent based on abandonment by his father.

The Fourth District Court of Appeal in <u>O.I.C.L.</u>, suggested:

> When evaluating the facts supporting these private dependency petitions, trial courts should consider: (1) the nature, severity and frequency of the abuse, neglect or abandonment; (2) the time that has elapsed between the abuse, neglect or abandonment and the filing of the petition; (3) whether the child is presently at a continued, but not necessarily imminent, risk of harm before turning eighteen years old; (4) the availability of a caregiver capable of providing both supervision and care; and (5) any other relevant factors unique to the particular case.

<u>O.I.C.L.</u>, 169 So. 3d at 1249.  In the instant case, the trial court noted that S.A.R.D.'s petition alleges abandonment by the father over ten years prior to S.A.R.D.'s departure for the United States and the filing of his dependency petition, and concluded that based on the law in the circuit and this district, the alleged abandonment was too remote to serve as a basis for dependency when the alleged abandonment did not cause S.A.R.D. any harm, noting that while the father did not care for S.A.R.D., S.A.R.D. continued to live with his mother and uncle, who did care for him.  In reaching this legal conclusion, the trial court correctly applied the law in this district.  See <u>In re K.B.L.V.</u>, 176 So. 3d 297, 299 (Fla. 3d DCA 2015) (finding that the abandonment of the seventeen-year-old child by her father since her birth was too remote); <u>In re B.Y.G.M.</u>, 176 So. 3d 290, 293 (Fla.

3d DCA 2015) (finding that the abandonment of the seventeen-year old child by his father since he was eight months old was too remote). These decisions were later followed by this Court. See In re F.J.G.M., 40 Fla. L. Weekly D1908 (Fla. 3d DCA Aug. 12, 2015); D.A.O.L. v. Dep't of Children & Families, 170 So. 3d 927 (Fla. 3d DCA 2015); M.J.M.L. v. Dep't of Children & Families, 170 So. 3d 931 (Fla. 3d DCA 2015); In re J.A.T.E., 17 So. 3d 931 (Fla. 3d DCA 2015).

S.A.R.D. was also at no substantial risk of imminent abuse, abandonment, or neglect when he filed his petition. When he filed his petition, he was nine days short of his eighteenth birthday and he had been living with and was being cared for by friends of his family in the United States since December 2014. There were no allegations that since his illegal arrival in the United States and his placement with family friends that he was not being adequately cared for or that he was neglected or abused by his caregivers. See § 39.01(10), Fla. Stat. (2015) (defining caregiver, as "the parent, legal custodian, permanent guardian, adult household member, or other person responsible for a child's welfare as defined in subsection (47)"). Subsection 47 provides in pertinent part:

> (47) "Other person responsible for a child's welfare" **includes** the child's legal guardian or foster parent; an employee of any school, public or private child day care center, residential home, institution, facility, or agency; a law enforcement officer employed in any facility, service, or program for children that is operated or contracted by the Department of Juvenile Justice; or any other person legally responsible for the child's welfare in a residential setting; and also includes an adult sitter or relative entrusted with a child's care.

11

(emphasis added).

Thus, it is clear that S.A.R.D., for the nine-day period of his minority status, was not in substantial risk of abuse, neglect, or abandonment. See O.I.C.L., 169 So. 3d at 1247-48 (finding that the release of the child to an uncle, while the child's immigration charges remained pending by the government agency that picked up the child following his attempt to illegally enter the United States, precluded an adjudication of dependency because the child's circumstances did not meet the definition of "abandonment").

Because the alleged abandonment by S.A.R.D.'s father in Honduras nearly eleven years prior to the filing of S.A.R.D.'s petition was too remote and S.A.R.D. presented no evidence that there was a substantial risk of abuse, neglect, or abandonment for the nine days from the filing of his petition until he reached the age of majority, the trial court correctly denied S.A.R.D.'s petition on the basis of abandonment by his father.

**B. Neglect by S.A.R.D.'s mother**

Section 39.01(30) Florida Statutes (2015) provides:

"Harm" to a child's health or welfare can occur when any person:

. . . .

(f) Neglects the child. Within the context of the definition of "harm," the term "neglects the child" means that the parent or other person responsible for the child's welfare fails to supply the child with

adequate food, clothing, shelter, or health care, **although financially able to do so or although offered financial or other means to do so**.

. . . .

(emphasis added). Section 39.01(44) also specifies that:

"Neglect" occurs when a child is deprived of, or is allowed to be deprived of, necessary food, clothing, shelter, or medical treatment or a child is permitted to live in an environment when such deprivation or environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired. **The foregoing circumstances shall not be considered neglect if caused primarily by financial inability unless actual services for relief have been offered to and rejected by such person. . . .**

(emphasis added).

The record reflects that S.A.R.D. lived in Honduras with his mother and his mother's other small children until he left for the United States in late 2014. S.A.R.D.'s claim of neglect by his mother is premised on his allegation that although he and his family had been supported by his maternal uncle, when his uncle was murdered in December of 2012, he was forced to work on a coffee farm to help subsidize his needs. Glaringly absent from his petition and this record is any claim or evidence that his mother was financially able to provide S.A.R.D. with adequate food, clothing, etc., but refused to do so.

Section 39.01(44) specifically recognizes that a finding of neglect requires a willfulness component—**the ability to provide for these needs** and the failure to provide them. As the Fourth District Court of Appeal aptly noted in O.I.C.L.:

> Contrary to the assertions raised in the child's petition, living conditions of the kind routinely found in many lesser-developed countries where parents are financially unable to support a child, including but not limited to situations such as dropping out of school at an early age, working fields for income to support a family, infrequent receipt of new clothes or shoes, and limited access to electricity or other utilities of any kind are, without more, insufficient to support a finding of dependency unless substantial, competent evidence supports a finding that the parents were financially able but refused to provide support thereby "evince[ing] a willful rejection of parental obligations," [S.H. v. Dep't of Children & Families, 880 So. 2d 1279, 1280 (Fla. 4th DCA 2004)], or that financial or relief services were offered to the parents and rejected.

O.I.C.L., 169 So. 3d at 1249.

In D.C. v. A.B.C., 8 A.3d 260 (N.J. Super. Ct. Ch. Div. 2010), the New Jersey Superior Court addressed the alleged neglect in Guatemala by the mother of a child ("Paul") who illegally entered the United States at age fourteen and petitioned the New Jersey Court for a finding of dependency under New Jersey's statutes that are similar to Florida's dependency statutes. Like S.A.R.D., Paul's claim of neglect by his mother was based on his mother's failure to provide for him and his need to work at a construction job to help support the family. In finding that there was insufficient evidence to establish neglect, the New Jersey Court noted the lack of evidence that Paul's mother's actions were intentional. Rather, the evidence demonstrated her inability to adequately support her family. D.C., 8 A.3d at 265-66. The court also noted that "Guatemala is one of the poorest countries in the world . . . [and that] about 15% of children between the ages of ten

to fourteen are working." Id. at 265. Thus, leaving school to work in order to help support the family is not uncommon in Guatemala, and because there was no evidence presented that the construction work Paul was performing caused physical injury or created a substantial risk of death or serious or protracted disfigurement, Paul's work in a construction job at the age of fourteen did not constitute abuse or neglect. Id. at 265-66.

Similarly, in the instant case, there is no record evidence that S.A.R.D.'s mother, who also had other children to care for, was financially able to meet S.A.R.D.'s needs, but refused to or that she rejected any offered financial assistance. There was also no evidence that S.A.R.D.'s mother exposed him to illegal drugs, kept her home in a deplorable condition, or that S.A.R.D.'s work on a coffee farm at the age of seventeen to assist the family subjected S.A.R.D. to abuse or harm. Thus, the family's poverty, without more, does not constitute neglect as contemplated by our dependency statutes, specifically sections 39.01(3)(f) and 39.01(44), and the trial court correctly denied S.A.R.D.'s petition based on his claim of neglect by his mother.

## CONCLUSION

While the plight of children growing up in poor and underdeveloped countries is heartbreaking when we consider the bountiful advantages available to the children in the United States, Florida's dependency statutes were meant to

15

protect children who are the victims of abuse, abandonment, or neglect, and who are in need of intervention by the court and services by the State. The primary goal of the statute is to preserve the family structure, not to provide a gateway to citizenship for children who are entering this country illegally in search of a better life. Because the trial court's finding that S.A.R.D. does not meet the evidentiary threshold to find him dependent on the basis of abandonment by his father and neglect by his mother, we affirm.

Affirmed.

SHEPHERD, J. concurring,

I concur in the decision of the majority and write only to emphasize that there are two separate and independent reasons to affirm the decision of the trial court in this case. First, as we have held in similar cases, the petition in this case fails on state law grounds. See In re B.R.C.M., No. 3D15-962 (Fla. 3d DCA Dec. 30, 2015); In re B.Y.G.M., 176 So. 3d 290 (Fla. 3d DCA 2015); In re K.B.L.V., 176 So. 3d 297 (Fla. 3d DCA 2015); see also O.I.L.C. v. Dep't of Children & Families, 169 So. 3d 1244 (Fla. 4th DCA 2015). However, the opinion of the court today reveals yet a second reason, and one arguably of a higher order, for the affirmance of the trial court's decision in such cases, namely that those who seek to stretch state dependency laws for the sole purpose of obtaining lawful residency, as opposed to relief from abuse, neglect or abandonment, are fostering outcomes

17

which are inconsistent with the laws and policies of our National Government. It is on this separate ground I wish to briefly comment.

The creation of the Special Immigrant Juvenile (SIJ) classification to assist certain children from foreign countries in seeking lawful residency in the United States was added to the United States Immigration and Naturalization Act (INA) in 1990.[2] See Immigration Act of 1990, Pub. L. 101–649, ch. I, sec. 153, 104 Stat. 4978 (adding subsection (J) to 8 U.S.C. § 1101(a)(27)). The original eligibility requirements for SIJ status were a court order determining that the juvenile alien was dependent on a juvenile court, and a judicial or administrative order that it would not be in the juvenile's best interest to be returned to the juvenile's home country.[3] However, because of perceived abuses of the SIJ classification discovered after its enactment in 1990, primarily its use as a method of obtaining legal permanent status, rather than for the more limited purpose of obtaining relief

---

[2] The INA was the first consolidated immigration legislation enacted in 1952. Prior thereto, immigration law was not organized into one cohesive code section. Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as 8 U.S.C. § 1158).

[3] As originally enacted, a SIJ was defined as:

> an immigrant (i) who has been declared dependent on a juvenile court located in the United States and has been deemed eligible by that court for long-term foster care, and (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence

Pub. L. 101-649, ch. I, sec. 153.

18

from abuse, abandonment or neglect, see Yeboah v. U.S. Dep't of Justice, 345 F.3d 216, 221 (3d Cir. 2003); M.B. v. Quarantillo, 301 F.3d 109, 114 (3d Cir. 2002), Congress amended section 1101(a)(27)(J) in 1997 to specify that in addition to being dependent upon a state juvenile court as eligible for long-term foster care, those eligible for SIJ status must also demonstrate their dependency on the state was "due to abuse, neglect or abandonment."[4] CJS 1998 Appropriations Act, Pub. L. No. 105–119, ch. I, sec. 113, 111 U.S. Stat. 2440, 2460.[5] If there was any

---

[3] Senator Pete Domenici of Arizona, one of the proponents of the proposed amendments to SIJ status, articulated the problem as follows: "[T]his is a giant loophole . . . every visiting student from overseas can have a petition filed in a State court declaring that they are a ward and in need of foster care . . . [and] **they are granting them.**" Attorney General Reviewing Potential Abuse of Immigration Law: Hearing on H.R. 2267 Before a Subcomm. of the Comm. on Appropriations, 105th Cong. 1 (1997) (statement of Pete Domenici, U.S. Senator) (emphasis added).

[5] As amended in 1997, section 1101(a)(27)(J) defined a SIJ as:

> (J) an immigrant **who is present in the United States**
>
> (i) who has been declared dependent on a juvenile court located in the United States **or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State and who** has been deemed eligible by that court for long-term foster care **due to abuse, neglect, or abandonment**;
>
> (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and
>
> (iii) **in whose case the Attorney General expressly consents to the dependency order serving as a precondition to the grant of special immigrant juvenile status;** except that –

question prior to the enactment of Public Law 105–119 that a "qualifying" state court dependency order had to be based on a finding of abandonment, abuse or neglect, the 1997 amendments to section 1101(a)(27)(J) operated to dispel the doubt. As a Congressional Report accompanying the proposed amendments stated:

> Sec. 113.–The conference agreement includes section 113, similar to language included in the Senate bill, that amends the Immigration and Nationality Act to address several problems encountered in the implementation of the special immigrant juvenile provision. **The language has been modified in order to limit the beneficiaries of this provision to those juveniles for whom it was created, namely abandoned, neglected, or abused children, by requiring the Attorney General to determine that neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent resident, rather than for the purpose of obtaining relief from abuse or neglect.** The conferees intend that the involvement of the Attorney General is for the purposes of determining special immigrant juvenile status and not for making determinations of dependency status. In addition, in order to preclude State juvenile courts from issuing dependency orders for juveniles in actual or constructive custody of the INS, the modified provision removes jurisdiction from juvenile courts to consider the custody status or placement of such aliens

> **(I) no juvenile court has jurisdiction to determine the custody status or placement of an alien in the actual or constructive custody of the Attorney General unless the Attorney General specifically consents to such jurisdiction; and**

> **(II)** no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded the right, privilege or status under this Act;

Pub. L. 105-119, ch. I, sec. 113 (modifications bolded).

unless the Attorney General specifically consents to such jurisdiction. The House bill did not contain a provision on this matter.

H.R. Rep. 105-405, at 130 (1997) (emphasis added).

In 2008, Congress amended the definition of a SIJ under section 1101(a)(27)(J) in two respects pertinent to this discussion. See William Wilberforce Trafficking Victims Protection Reauthorization Act, Pub. L. No. 110–457, 122 U.S. Stat. 5044 (2008). The requirement that the SIJ applicant be deemed eligible "for long-term foster care" by a state court was removed. Additionally, the SIJ applicant now needed to establish that reunification was not viable with "one or both parents." Id. at sec. 235(d)(1). However, the demonstration by the juvenile petitioner of "abuse, neglect or abandonment . . . under State law" remained as an important prerequisite to attainment of SIJ status.[6]

_____

[6] Since the 2008 amendments, subsection 1101(a)(27)(J) reads:

(J) an immigrant who is present in the United States –

(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable **due to abuse, neglect, abandonment, or a similar basis found under State law**;

(ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

It is axiomatic that "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government." Truax v. Raich, 239 U.S. 33, 42 (1915); see also Galvan v. Press, 347 U.S. 522, 531 (1954) (recognizing that formulation of "[p]olicies pertaining to the entry of aliens and their right to remain here" are "entrusted exclusively to Congress"). This authority, of course, derives from our federal constitution. Art. I, Sl. 8, U.S. Const. ("The Congress shall have Power . . . To establish an uniform Rule of Naturalization . . . ."). Pursuant to this authority, the United States Congress created a specific classification of juveniles, the SIJ classification, for the purpose of assisting a limited group of children from foreign countries, who have been "abuse[d], neglect[ed] or abandon[ed]" under state law, in seeking lawful residence in the United States.

---

(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status, except that—

(I) no juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction; and

(II) no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter;

8 U.S.C.A. § 1101 (2010) (emphasis added).

S.A.R.D., and juveniles who are similarly situated, are neither abused, neglected nor abandoned under the law of this state. Instead, their petitions seek a declaration of dependency from our state family courts solely on the hope that the United States government ultimately will confer lawful residency status upon them.[7] However, Florida courts are not empowered to promote or incent immigration outcomes in conflict with the law and policies of our National Government. See Arizona v. U.S., 132 S.Ct. 2492 (2012). For this additional reason, we correctly affirm the decision of the trial court in this case.[8]

---

[7] One commentator, an advocate for expansion of the SIJ immigrant class, has stated that once a petitioner is awarded SIJ status, the individual is automatically eligible to adjust to legal permanent resident status which, if granted, makes a child eligible for a work permit, driver's license, subsidized health insurance and financial aid for higher education and, five years later, citizenship. See Shannon Aimee Daugherty, Special Immigrant Juvenile Status: The Need to Expand Relief, 80 Brook. L. Rev. 1087, 1088-89 (Spring 2015). In this context, it seems apparent that obtaining the required dependency order with the necessary findings constitutes the greatest hurdle to eventual naturalization for these juveniles. Id.

[8] Parenthetically, I must respectfully demur from the statement in the majority opinion that the Department of Children and Families previously declined to involve itself in these proceedings because the petitions were "private petitions." Maj. Op. at ___. As counsel for the Department admitted at oral argument in B.R.C.M., our opinion in B.Y.G.M., 176 So. 3d at 290, coaxed the Department to re-engage as a participant in these cases. I make the point only in the event the willingness of the Department to engage in appropriate participation in these cases must be called into question again at some future time.