*899 ROTHENBERG, J.
S.A.R.D. appeals a final order dismissing his private petition for dependency entered on May 13, 2015, two days before S.A.R.D. reached .the age of majority. Because the record supports the trial court’s finding that S.A.R.D. was not abandoned, abused, or neglected by his mother, we agree that S.A.R.D. failed to establish that he is a dependent child under Chapter 39, Florida Statutes (2015). Accordingly, we affirm.
The operative facts are as follows. S.A.R.D., who was bom in Honduras on May 15, 1997, wás seventeen years old when he illegally crossed the border between Mexico and the United States. He was just nine days shy of reaching the age of majority when he filed his petition for dependency on May 6, 2015, and he is now eighteen.
In his petition, S.A.R.D. allegés that when he was seven years old, over ten years ago, his father abandoned him. Since his father abandoned him, he has lived with his mother and maternal uncle, who cared and provided for him. When his uncle was murdered on December 26, 2012, S.A.R.D. continued to' live with his mother, but at some point he began working on a coffee farm to subsidize his heeds. In 2014, he left his mother and Honduras and illegally entered the United States. He is seeking an order of dependency under section 39.01, Florida Statutes (2015), on the basis of abandonment by his father and neglect by his mother in order to become eligible for a Special Immigrant Juvenile (“SIJ”) status visa under 8 U.S.C. § 1101(a)(27)(J) of the Immigration and Nationality Act, and ultimately to obtain permanent immigration status in this country. S.A.R.D. is uneducated and he has only recently learned to write his own name by attending special classes' in the United States.
THE IMMIGRATION ACT OF 1990
The Immigration Act of 1990 (“the Act”) created' a category of “special immigrants” who are entitled'to obtain permanent immigration status in this cduntry. 8 U.S.C. § 1101(a)(27). One such category is for ündocumented/illegal youths who are under protection of a state juvenile, family, or probate court. Id. at § 1101(a)(27)(J). To qualify for an SIJ visa, the minor must be a juvenile immigrant who is present in the' United States and
(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both' of the immigrant’s parents is not viable’due to abuse, neglect, abandonment, or a similar basis found'under State law;
(ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien’s best interest to be returned to the alien’s or parent’s previous country of nationality or' country of last habitual residence; and • •
(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status!.]

Id.

“The SIJ provisions of [the ACT] were enacted in 1990 to protect abused, neglected, or abandoned children who, with their families, illegally entered the United .States.” Yeboah v. United States Dep’t of Justice, 345 F.3d 216, 221 (3d Cir. 2003). “Rather than being deported along with abusive or- neglectful. parents, or deported to parents who had abandoned them once in the United States, *900 such children may seek special status to remain in the -United States.” , Id. However, when visiting students from other countries began abusing the Act to improve their immigration status, Congress amended subparagraph. (J) in 1997 to require the juvenile to be deemed eligible for long-term foster care due to abuse, neglect, or abandonment. Id. at 222; see also 8 U.S.C. § 1101(a)(27)(J)(i). To be eligible for long-term foster care, the Act required a court or agency to find that it was not in , the juvenile’s best interests to return to his or her home country. 8 U.S.C. -'§ 1101(a)(27)(J)(ii); 8 C.F.R. § 204.11(c)(6). Congress also' amended the Act to require the United States Attorney General’s consent to conduct'.an SIJ proceeding. 8 U-S.C. § 1101 (a) (27) (J) (iii) (I). ’
In 2008, Congress eliminated the requirement that the child be eligible for long-term foster care, see 8 U.S-C.A. § 1101(a)(27)(J)(i), and added language requiring the inability of the child to be reunited with “1 or both” parents because of “abuse, neglect, abandonment, or a similar basis” under state law. Id.
Thus, the procedure provided for obtaining SIJ status is a two-step procedure. First, the child must petition a state juvenile, court to obtain an order that makes findings that the child satisfied certain state dependency criteria. This order is a predicate before a child can submit his or her application for SIJ status. The juvenile court does not make an immigration determination. In re Marcelina M.G. v. Israel S., 112 A.D.3d 100, 109, 973 N.Y.S.2d 714 (N.Y.App.Div.2013). If the child obtains an order finding him dependent in state juvenile court and obtains a best interest order, he can then apply for SIJ status,- which, if obtained, will permit the child'to apply for adjustment of status under 8 U.S.C.A. § 1265 in an effort to obtain legal permanent residency and, eventually, United States citizenship. 8 U.S.C.A. M255. ,
As the Third Circuit Court of Appeals noted in M.B. v. Quarantillo, 301 F.3d 109, 114 (3d Cir.2002), “Being granted such status is, of course, quite advantageous- to an alien.” For example, SIJ 'status provides exemption from deportation on certain grounds, including for being present in the United States illegally. 8 U.S.C.A. § 1227(a)(l)(B-C). A juvenile granted SIJ status is deemed “to have been' paroled into the United States” for purposes of discretionary adjustment of his status “to that of an alien lawfully admitted for permanent residence.” .8 U.S.C.A. § 1255(a), (h)(1), and certain grounds of-inadmissibility do not- apply (including unlawful entry into the- United States), and other grounds may be waived by the Attorney General. 8 U.S.C.A. § 1255(h)(2); 8 U.S.C.A. § 1182. As is obviously apparent, obtaining an order of dependency and SIJ status allows the child who entered the United States or stayed in the United States illegally to jump to the front of the line of those who are attempting to immigrate to the United States lawfully and to .bypass many of the requirements established for regular legal immigration. ,. , ,
What' is' troubling about this bifurcated procedure is that, although it is clear that under our federal system the “[pjolicies pertaining to the entry of aliens and their rights to remain here are. ... entrusted exclusively to Congress,” In the Interest of K.B.L.V., 176 So.3d 297 (Fla. 3d DCA 2015) (Shepherd, J., specially concurring) (quoting Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737/98 L.Ed, 911 (1954)), we are being asked to provide an initial stamp of approval to a child’s, request for SIJ status and permanent residency as if we are federal customs agents. And, because the matter is before the dependency court, *901 the dependency court' must base its decision, in part, on what is in the best interest of the child, as opposed to what is in the best interest of the country.
Even more troubling is the attempt to expand the stated purpose of the Act. As stated earlier, “[t]he SIJ provisions of [the ACT] were enacted in 1990 to protect abused, neglected, or abandoned children who,, with their families, illegally entered the United States.” Yeboah, 345 F.3d at 221. (emphasis added). These provisions allowed such children to seek SIJ special status to remain in this country “[rjather than being deported along with the abusive or neglectful parents, or deported to parents who. had abandoned them once in the United States.” Id. (emphasis added). The purpose of the Act was not to provide exemption from .deportation to children who leave their families and homes in other countries, with or without the encouragement' and support of their families, and illegally enter'the United States without their parent(s) in search of a better life. That, however, is the scenario we are seeing in the current influx of dependency petitions filed by children who have entered the United States illegally.
The attempt to expand the stated purpose of the Act,not only encourages parents to send their children to the United States and children to leave their families and homes to illegally enter the United States, it also places a very difficult burden upon the state courts tasked with reviewing these dependency petitions and making a dependency determination. A dependency petition which alleges abusé, abandonment, or neglect by a child’s parents) requires investigation. Investigating such allegations stemming from alleged conduct in the United States, while challenging and costly, is'possible. Investigating such allegations regarding parents living in another country is nearly impossible; Testing the veracity of an affidavit from a parent who sent or endorsed a child’s exodus from his native country and family to seek a better life in the United States is equally nearly impossible. And yet, that is what the state courts are being asked to do.
ANALYSIS
Although we have articulated the problems associated with petitions for dependency filed by, children who leave their families for another country and illegally enter the United States and are seeking SIJ Statutes, the instant petition was properly decided as a matter of law.
S.A.R.D. sought an adjudication of dependency pursuant to Chapter 89 of the Florida dependency statutes. Chapter 89 defines a dependent child,- in part, as one who has been “abandoned, abused,-or neglected” by the child’s ■ “parents or legal custodians.” § 39.01(15)(a), Fla. Stat. (2015).
These petitions have become increasingly common and typically are filed just before the child, who illegally crossed the border into the United States, turns eighteen. Because this was a private petition, the Department of Children arid Families (“DCF”) declined to involve itself in any of the proceedings and no testimony or opposing argument was presented to the trial court.[1] The child does not seek any services from the State. Thus, the petition viras not subjected to a true adversarial proceeding at the trial court level, arid this Court was not presented'[1] with opposing argument or analysis on appeal. As the Fourth District Court of Appeal correctly noted in O.I.C.L. v. Department of Children & Families, 169 So.3d 1244, 1247 *902 (Fla. 4th DCA 2015), review granted, SC15-1570, 2015 WL 6854614 (Fla. Oct. 30, 2015), “[a]t their core, these petitions are probably best described as merely an unopposed request for assistance of the court for ¡entry of orders to help a child obtain legal immigration status.” (internal quotation omitted).
After reviewing the petition, the trial court in the instant case denied S.A.R.D.’s dependency petition. “A trial court’s discretion in child welfare proceedings is very broad.” O.I.C.L., 169 So.3d at 1247. Becausé a trial court’s ruling on a dependency petition is a mixed question of law and fact, we review findings of fact for competent substantial evidence, E.R. v. Dep’t of‘Children & Families, 143 So.3d 1131, 1134 (Fla. 4th DCA 2014), and we review the trial court’s interpretation. of the law de novo. See C.R. v. Dep’t of Children & Family Servs., 53 So.3d 240, 242 (Fla. 3d DCA 2010); G.C. v. Dep’t of Children & Families, 791 So.2d 17, 19 (Fla. 5th DCA 2001).
In his petition, S.A.R.D. alleged that he was abandoned by his father at the age of seven and neglected by his mother.at some point after December 2012. We address each ground in turn. .

A. Abandonment by S.A,R.D.’s father

Section 39.01(1), Florida Statutes (2015), defines “abandonment” as:
[A] situation in which the parent or legal custodian of a child or,.in the absence of a parent or legal custodian, the caregiver, while being able, has made no significant contribution to, the child’s care and maintenance or has, failed to establish or maintain a substantial and positive relationship with the child, or both.
S.A.R.D. contends that abandonment by his father is undisputed. As already noted above, however, S.A.R.D.’s petition was not subjected to an adversarial proceeding because he filed a private petition, sought no services from the State, and DCF was not involved. We conclude, however, that even if the allegations are treated as true, the trial court correctly declined to adjudicate S.A.R.D. dependent based on abandonment by his father.
The Fourth District Court of Appeal in O.I.C.L., suggested:
When evaluating the facts supporting these private dependency petitions, trial courts should consider: (1) the nature, severity and frequency of the abuse, ne-gléct or abandonment; (2) the time that has elapsed between the abuse, neglect or abandonment' and the filing of the petition; (3) whether the child is presently at a continued, but not necessarily imminent, risk of harm before turning eighteen years old; (4) the availability of a caregiver capable of providing both supervision and care; and (5) any other relevant factors unique to the particular case. ■
O.I.C.L., 169 So.3d at. 1249. In the instant case, the trial court noted that S.A.R.D.’s petition alleges abandonment by the father over ten years prior to S.A.R.D.’s departure for the United States and the filing of his dependency petition, and concluded that based on the law in the circuit and this district, the alleged abandonment was too remote to serve as a basis for dependency when the alleged abandonment did not cause S.A.R.D. any harm, s noting that while the father did not care for S.A.R.D., S.A.R.D. continued to live with his mother and uncle, who did care for him. In reaching this legal conclusion, the trial court correctly applied the law in this district. See In re K.B.L.V., 176 So.3d 297, 299 (Fla. 3d DCA 2015). (finding that the abandonment of the seventeen-year-old child by her father since her birth was too remote); In re B.Y.G.M., 176 So.3d 290, 293 (Fla. 3d DCA 2015) (finding that the abandonment of the seventeen-year old child by his fa *903 ther since he was eight months old was too remote). These decisions were later followed by this Court. See In re F.J.G.M., 40 Fla. L. Weekly D1908, — So.3d-, 2015 WL 4750939 (Fla. 3d DCA Aug. 12, 2015); D.A.O.L. v. Dep’t of Children & Families, 170 So.3d 927 (Fla. 3d DCA 2015); M.J.M.L. v. Dep’t of Children & Families, 170 So.3d 931 (Fla. 3d DCA 2015); In re J.A.T.E., 170 So.3d 931 (Fla. 3d DCA 2015).
S.A.R.D. was also at no substantial risk of imminent abuse, abandonment, or neglect when he filed his petition. When he filed his petition, he was nine days short of his eighteenth birthday and he had been living with and was being cared for by friends of his family in the United States since December 2014. There were no allegations that since his illegal arrival in the United States and his placement with family friends that he was not being adequately cared for or that he was neglected or abused by his caregivers. See § 39.01(10), Fla. Stat. (2015) (defining caregiver, as “the parent, legal custodian, permanent guardian, adult household member, or other person responsible for a child’s welfare as defined in subsection (47)”). Subsection 47 provides in pertinent part:
(47) “Other person responsible for a child’s welfare” includes the child’s legal guardian or foster parent; an employee of any school, public or private child day care center, residential home, institution, facility, or agency; a law enforcement officer employed in any facility, service, or program for children that is operated or contracted by the Department of Juvenile Justice; or any other person legally responsible for the child’s welfare in a residential setting; and also includes an adult sitter or relative entrusted with a child’s care.
(emphasis added).
Thus, it is clear that S.A.R.D., for the nine-day period of his minority status, was not in substantial risk of abuse, neglect, or abandonment. See O.I.C.L., 169 So'.3d at 1247-48 (finding that the release of the child to an uncle, while the child’s immigration charges remained pending by the government agency that picked up the child following his attempt to illegally enter the United States, precluded an adjudication of dependency because the child’s circumstances did not meet the definition of “abandonment”).
Because the alleged abandonment by S.A.R.D.’s father in Honduras nearly eleven years prior to the filing of S.A,R.D.’s petition was too remote and, S.Á.R.D. presented no evidence that there was a substantial risk of abuse, neglect, or abandonment for the nine days from the filing of his petition until he reached the age of majority, the trial court correctly denied S.A.R.D.’s petition on the basis of abandonment by his father.

B. Neglect by S.A.R.D.’s mother

■ Section 39.01(30) Florida Statutes (2015) provides:
“Harm” to a child’s health or welfare can occur when any person:
[[Image here]]
(f) Neglects the child. Within the context of thé definition of “harm,’’.the term “neglects the child” means that the parent or other person responsible for the child’s welfare fails to supply the child with adequate food, clothing, shelter, or health care, although financially able to do so or although offered, financial or other means to do so_
(emphasis added). Section 39.01(44) also specifies that:
“Neglect” occurs when: a child is deprived of, or is allowed to be deprived of, necessary food, clothing, shelter, or medical treatment or a child is permitted to live in an environment when such *904 deprivation or environment causes the child’s physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired. The foregoing circumstances shall not be considered neglect if caused primarily by financial inability unless actual services for relief have been offered to and rejected by such person_
(emphasis added).
The record reflects that S.A.R.D. lived in Honduras with his mother and his mother’s other small children until he left for the ’ United States in late 2014. S.A.R.D.’s claim of neglect by his mother is premiséd oh his allegation that although he and his family had been supported by his maternal uncle, when his uncle was murdered in December of 2012, he was forced to work on a coffee farm to help subsidize his needs. Glaringly absent from his petition and this record’ is any claim or evidence that his mother was financially able to provide S.A.R.D. with adequate food, clothing, etc., but refused to do so.
Section 39.01(44) specifically recognizes that a finding of neglect requires a willfulness component — the ability to provide for these needs and the failure to provide them. As the Fourth District Court of Appeal aptly noted in O.I.C.L.:
Contrary to the assertions raised in the child’s petition, living conditions-of .the . kind routinely found in many lesser-developed countries where parents are financially unable .to support a child, including but not limited tó situations such as dropping out of school at an early age, working fields for income to support a family, infrequent receipt of new clothes or shoes, and limited access to electricity or other utilities of any kind are, without more, insufficient to support a finding of dependency unless substantial,' competent evidence supports a finding that the parents were financially able but refused to provide support thereby “evince[ing] a willful rejection of parental obligations,” [S.H. v. Dep’t of Children & Families, 880 So.2d 1279, 1280 (Fla. 4th DCA 2004)], or that financial or relief services were offered to the parents and rejected.
O.I.C.L., 169 So.3d at 1249.
In D.C. v. A.B.C., 417 N.J.Super. 41, 8 A.3d 260 (2010), the New Jersey Superior Court addressed the alleged neglect • in Guatemala by the mother of a child (“Paul”) who illegally entered the United States at age fourteen and petitioned the New Jersey'Court for a finding of dependency under New Jersey’s statutes that are similar to Florida’s dependency statutes. Like S.A.R.D., Paul’s claim of neglect by his mother was based on his mother’s failure to provide for him and his need to work at a construction job to help support the family. In finding that there was insufficient evidence to establish neglect, the New Jersey Court noted the lack of evidence that Paul’s mother’s actions were intentional. Rather, the evidence demonstrated her inability to adequately support her family. D.C., 417 N.J.Super. 41, 8 A.3d at 265-66. The court also noted that “Guatemala is one of the poorest countries in the world ... [and that] about 15% of children between the ages of ten to fourteen are working.” Id. at 265. Thus, leaving school to-work in order to help support the family is not uncommon in Guatemala, and because there was no evidence presented that the -construction work Paul was performing caused physical injury or created a substantial risk of death or serious or protracted disfigurement, Paul’s work in a construction job at the age of fourteen did not constitute abuse or neglect. Id. at 265-66.
Similarly, in the instant- casé, there is no record evidence that S.A.R.D.’s mother, who also had other children to care for, *905 was financially able to meet S.A.R.D.’s needs, but refused to or that she rejected any offered financial assistance. There was also no evidence that S.A.R.D.’s mother exposed him to illegal drugs, kept her home in a deplorable condition, or that S.A.R.D.’s work on a coffee farm at the age of seventeen to assist the family subjected S.A.R.D. to abuse or harm. Thus, the family’s poverty, without more, does not constitute neglect as contemplated by our dependency statutes, specifically sections 39.01(3)(f) and 39.01(44), and the trial court correctly denied S.A,R.D.’s petition based on his claim of neglect by his mother.
CONCLUSION
While the plight of children growing up in poor and underdeveloped countries is heartbreaking when we consider the bountiful advantages available to the children in the United States, Florida’s dependency statutes were meant to protect children who are the victims of abuse, abandonment, or neglect, and who are in need of intervention by the court and services by the State. The primary goal of the statute is to preserve the family structure, not to provide a gateway to citizenship for children who are entering this country illegally in search of a better life. Because the trial . court’s finding that S.A.R.D. does not meet the evidentiary threshold to find him dependent on the basis of abandonment by his father and neglect by his mother, we affirm.
Affirmed.

. Although generally' DCF’ had declined to participate in these private dependency proceeding, it now appears that DCF is beginning to participate in these cases.